**COPY–DATA, et al., Plaintiffs,**

v.

**TOSHIBA AMERICA, INC., Defendant.**

**No. 75 Civ. 1368(RO).**

United States District Court,
S.D. New York.

March 23, 1984.

Frank, Bernstein, Conaway & Goldman, Baltimore, Md., Lambos, Flynn, Nyland & Giardino, New York City, for plaintiffs; Robert G. Levy, Berryl A. Speert, Allan P. Hillman, John M. Belferman, Baltimore, Md., Donato Caruso, New York City, of counsel.

Ford, Marrin, Esposito & Witmeyer, New York City, for defendant; John J. Witmeyer, III, New York City, of counsel.

## OPINION AND ORDER

OWEN, District Judge.

Plaintiff Copy-Data brought this action in March, 1975, alleging violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pendent claims based on New York law for unfair competition and breach of Contract. Following a trial on liability on June 8, 1979, I made findings of fact, here incorporated by reference, on the basis of which I concluded that defendant's conduct constituted a *per se* violation of the Sherman Act. As plaintiff conceded in its proposed findings of fact, with the award of treble damages on the Sherman Act claim it was unnecessary to resolve the state law claims. I therefore made no determination as to plaintiff's allegations of breach of contract and unfair competition.

Following a further trial on the issue of damages, on September 30, 1980, I made further findings also here incorporated, and awarded treble damages based on the value of Copy-Data before defendant's conduct forced it into bankruptcy.

On appeal, the Second Circuit reversed, 663 F.2d 405, rejecting the application of the *per se* rule to plaintiff's claim under the Sherman Act, but remanded for a determination as to plaintiff's claims that defendant's conduct was a violation of the New York law of contracts and unfair competition.[1] Since the action was originally tried with these claims in issue, I took no new evidence, but received additional briefing on these issues.

As observed in my opinion of June 8, 1979, Copy-Data began to establish a network of dealers for the then unknown Toshiba line of copying machines in New England, New York and New Jersey ("the Northeast") in 1970. This involved sponsoring demonstrations, soliciting dealers, training dealers' service representatives and all other aspects of developing a Toshiba dealer network. All costs associated with this undertaking were paid by Copy-Data. In 1972, Copy-Data began to expand its Toshiba sales into the "Middle Atlantic States," consisting of Maryland, Virginia, Pennsylvania, Delaware, West Virginia and the District of Columbia. Thereafter, at Toshiba's request, Copy-Data began to develop the Chicago, Illinois market.

Approximately nine months after it began to sell Toshiba machines in Chicago, Copy-Data was advised that Toshiba would begin distributing directly in Chicago and that Copy-Data was to turn over its accounts and all information regarding the dealers Copy-Data had developed in that city. This began a pattern of coercion by which Toshiba wrested from Copy-Data its customer lists and then its customers. In early 1973, Toshiba demanded and received a list of all Copy-Data dealers on the representation that it was only to be used to keep Copy-Data's dealers apprised of new products and other changes in the Toshiba line. Later that year, the network Copy-

---

1. The Court of Appeals originally remanded with an instruction to dismiss the complaint but, after plaintiff petitioned the court to modify its order to allow it to proceed on its state law claims, the Court of Appeals modified its instruction, directing dismissal only of the Sherman Act claim.

Data had developed for Toshiba in the mid-Atlantic states was taken over by Toshiba with threats that a refusal to cooperate would result in the termination of Copy-Data's more valuable distributorship in the northeast. Ultimately, Toshiba also attempted to take over Copy-Data's dealer network in the northeast and restrict plaintiff's sales to New Jersey, only backing away from that effort when the instant complaint was filed. The trial record was clear that throughout 1973 and 1974, Toshiba was pleased with Copy-Data's performance on its behalf. See Fn. 2 below.

A second area of coercive conduct, and the one which ultimately led to Copy-Data's bankruptcy, involved the unusual circumstances surrounding the marketing of Toshiba's BD–702 copier. The prospect of selling the BD–702, Toshiba's first plain-paper copier, in the Northeast was a major inducement for Copy-Data not to "rock the boat" when its Chicago and mid-Atlantic markets were taken away. However, in the fall of 1974, when Toshiba began its efforts to limit plaintiff's sales to the state of New Jersey, it also took several steps to impede Copy-Data's ability to compete effectively in its remaining territory. First, Toshiba induced Copy-Data to purchase $50,000 worth of unneeded coated-paper copiers with the assurance that these purchases would not be charged to Copy-Data's credit line. This assurance proved false and the charges for these coated-paper copiers, purchased on the eve of the introduction of the BD–702 plain paper copier, destroyed its credit line and resulted in Copy-Data having to pay for its initial order of BD–702's in advance. Thereafter, Copy-Data was required to pay cash for all BD–702 orders.

Thereafter as it became obvious that, contrary to Toshiba's wishes, Copy-Data was continuing to distribute to dealers outside New Jersey, Toshiba compounded Copy-Data's cash flow problem by refusing to accept any returns of defective BD–702's, contrary to its normal practice. This selective refusal to accept returns was intended to drive Copy-Data out of the northeast, and thus out of business, and, in combination with the loss of many of its dealerships and its credit line, this final, discriminatory tactic did eventually force Copy-Data out of business.

Plaintiff now advances two separate theories under which defendant may be held liable for the destruction of its business—a tort theory of unfair competition, and breach of contract. As discussed below, I find that plaintiff has sustained its claims on both theories.

### I. *Unfair Competition*

 It is clear, as I found in my original findings of fact and conclusions of law, that Toshiba's conduct toward Copy-Data "unquestionably damaged the plaintiff, making it impossible for the plaintiff to succeed financially." Damage alone is not, of course, enough to establish liability for the tort of unfair competition. Unfair competition must involve damage by some unfair or improper means. The essence of the tort is the effort by a defendant to misappropriate the fruits of another's efforts or "reap where it has not sown." *International News Service v. Associated Press,* 248 U.S. 215, 239, 39 S.Ct. 68, 72, 63 L.Ed. 211 (1918).

In *International News Service,* the Supreme Court enjoined the pirating of news, writing:

> Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not . . . ,"

248 U.S. 215, 239, 39 S.Ct. 68, 72.

Toshiba's conduct in the instant action, while accomplished by somewhat different means, fits this description of prohibited activity rather precisely.

Toshiba induced Copy-Data to undertake the rather monumental tasks of introducing its products and developing a dealer network for them in the most populous areas of the United States. Then, after

what Toshiba executives acknowledged before me was a period of great effort and expense by Copy-Data, Toshiba sought to take over this dealer network. It is reasonable to assume that, had Toshiba simply informed Copy-Data, in early 1973, that it desired to take over all Copy-Data's distributorships, Copy-Data would not have given them up, along with its dealer evaluations and records of acknowledged value, without considerable compensation. By pursuing a more devious route, Toshiba was able to misappropriate this work product for no consideration whatsoever.

Toshiba now urges that its course of conduct towards Copy-Data was a reasonable response to concerns about Copy-Data's performance, based on "neutral" business decisions, and that it cannot therefore be held liable for its actions. The record clearly undercuts this alleged urgent concern, and I did not and do not credit defendant's tortured explanations of its behavior.[2] I find that Toshiba's conduct was motivated by a desire to appropriate Copy-Data's network, to avoid paying for the development of that network and, in order to accomplish the final stage of this scheme, to drive Copy-Data out of business.

The law of New York, particularly sensitive to fairness in commercial dealings because of its central place in the regulation of the nation's commerce, has long prohibited the kind of commercial immorality in which defendant has engaged.

> The modern view as to the law of unfair competition does not rest solely on the ground of direct competitive injury, but on the broader principle that property rights of commercial value are to be and will be protected from any form of unfair invasion or infringement and from any form of commercial immorality, and a court of equity will penetrate and restrain every guise resorted to by the wrongdoer.

*Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483, 492; *aff'd.* 107 N.Y.S.2d 795 (Sup.Ct.1950).

Contrary to Toshiba's assertions, manufacturers which operate through distributors, such as Copy-Data, are not immune from the prohibitions of this area of tort law. The special, confidential nature of relationships between manufacturers and distributors has often been scrutinized for just the sort of immoral and unreasonable behavior which I find in the instant action. *A.S. Rampell Inc. v. Hyster Company*, 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (Ct.App.1957) involved a similar case of malicious destruction by a manufacturer of a distributor's business. In *Walley v. Saks*, 266 App.Div. 193, 41 N.Y.S.2d 739 (Sup.Ct.1943) the plaintiff was a purchasing agent who built a customer list for defendant's products over seven years, and was then informed that defendant was terminating his account and going after his customers. The Appellate Division condemned this conduct, clearly analogous to that of Toshiba in the instant action, writing that:

> Defendant should not be permitted to take advantage of the knowledge it acquired of the names of plaintiff's customers at the expense of the plaintiff, where it would not have obtained those names without having entered into the arrangement for the opening of plaintiff's charge account.

\* \* \* \* \* \*

---

**2.** One of the most flawed aspects of Toshiba's explanation of its action is its insistence that Copy-Data's poor performance and financial condition was the basis for its termination in the middle Atlantic states and Chicago. This assertion seems to ignore the fact that Toshiba did not obtain the financial data to which it points in justification of these 1973 decisions until 1974. Furthermore, the allegations about Toshiba's concern with performance is made in spite of significant testimony, both in deposition and at trial, along the lines of that by Toshiba's national sales manager:

> I would say that Copy-Data is one of the most professional companies that I've been privileged to do business with . . . .
> They sold an awful lot of our equipment. To the best of my knowledge, they did not involve Toshiba over the years they did business with us in any legal matters, in any major customer complaints. They were a good company. (Johnston dep., p. 186)

This case involves a species of unfair competition. As pointed out by the trial justice, plaintiff has at considerable expense built up a certain good will. Defendant by its action seeks to destroy it. Without compensation to the plaintiff, it believes it has the right to appropriate to its own use the names of plaintiff's customers. That is not fair, just, or ethical. 41 N.Y.S.2d at 743.

■ On the overwhelming evidence in the record before me, and the clear prohibitions of the law of New York discussed above, I find that plaintiff has established its right to recover for the tortious destruction of its business.

## II. *Breach of Contract*

[4, 5] Copy-Data's contracts with Toshiba for its exclusive distributorship in certain states and non-exclusive distribution rights in other states were terminable at will.[3] Inherent in every such "at will" contract is a requirement that it be for a reasonable period and that reasonable notice be given before termination. In contracts between manufacturers and distributors, this requirement has frequently been held to provide for the opportunity to recover investments made to promote the products of another:

> A similar result has been reached though the dealer is a buyer-distributor rather than a technical agent, where in addition to undertaking to pay for the manufacturer's products as ordered, he promises to establish or maintain adequate sales and demonstration facilities or to provide a maintenance and repair service for handling said products. Thus, where substantial sums of money were expended "in developing a distributorship system" throughout a certain territory, it was held that the distributor was entitled to retain his franchise "for

such a period of time as would enable it to recoup expenditures incurred in reliance upon the agreement."

9 *Williston on Contracts*, § 1017A(3) at 152 (3d ed. 1967) (citations omitted); *see Jack's Cookie Co. v. A.A. Brooks*, 227 F.2d 935 (4th Cir.1955), *cert. denied* 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. 1443 (1956).

Here, Copy-Data expended its energy and resources to develop a network of Toshiba distributors in the northeast, then in the mid-Atlantic states, and finally in Chicago. It was never able to recover the profits reasonably expected from its dealings with Toshiba in any of these areas and was ultimately driven out of business, and thus deprived of any future profits, by Toshiba's actions. What constitutes a reasonable duration and reasonable notice is, of course, dependent on the facts and circumstances of each case. I find that, while in a narrow chronological sense, Toshiba's notice that Copy-Data was to withdraw from these various areas was reasonable, the course of conduct which surrounded and led to each of these terminations, was so unreasonable as to deprive Copy-Data of the opportunity to recoup its investment in the development of the Toshiba distribution network.

■ Another aspect of all contractual relationships is the duty of good faith dealing. While Toshiba was under no duty to continue to utilize Copy-Data as a distributor, it was obligated to conduct its dealings with Copy-Data as to this and other matters in good faith. *Zimmer v. Wells Management Corp.*, 348 F.Supp. 540 (S.D.N.Y. 1972); *see also Beidler & Bookmyer v. Univ. Ins. Co.*, 134 F.2d 828 (CA2 1943). This requirement of good faith dealing was clearly not met in this case. I therefore find that Toshiba is liable for damages due to its breach of the requirements of good

---

**3.** Copy-Data acknowledges that its agreements to distribute Toshiba products in the three relevant areas were oral. The initial agreement regarding the northeast was confirmed by a letter of appointment in 1971. Defendant asserts that any claim for breach of contract is barred by the statute of frauds. Such a defense is clearly not available where, as here, a plaintiff was induced by oral agreements to alter its position to its detriment and to defendant's advantage. *Gem Corrugated Box Corp. v. National Kraft Container Corp.*, 427 F.2d 499 (2d Cir. 1970).

faith dealing and of a reasonable opportunity for a distributor such as Copy-Data to recoup its investments.

### III. *Damages*

 The damages recoverable for defendant's breaches of its contractual duties discussed above are subsumed within the damages for the tortious destruction of Copy-Data's business. It is therefore unnecessary for me to inquire further into the extent of the contract damages in this matter. This is a case which, while involving certain breaches of contractual duties, is most appropriately actionable in tort. As stated in the leading New York case on this sort of malicious business dealing:

> ... a breach of contract may be so intended and planned; so purposely fitted to time, and circumstances and conditions; so inwoven into a scheme of oppression and fraud; so made to set in motion innocent causes which otherwise would not operate, as to cease to be a mere breach of contract, and become, in its association with the attendant circumstances, a tortious and wrongful act or omission.

*Rich v. New York Central & Hudson River Railway Co.*, 87 N.Y. 382 (Ct.App.1882)

Defendant's liability in tort is appropriately measured by the full extent of the injury it caused plaintiff. As I found in my earlier opinion on damages, it is more likely than not that absent the defendant's tortious conduct, plaintiff would have survived its financial difficulties and become profitable. Thus, defendant's conduct was the direct causal factor in plaintiff's demise and bankruptcy. It is therefore appropriate that plaintiff be compensated for the full value of its enterprise at the point when defendant, by its wrongful conduct, commenced the destruction of its value. 13 *N.Y.Jur. Damages*, § 61 at p. 512. To the extent there is uncertainty as to the precise amount of loss brought about by defendant's conduct, defendant must "bear the risk of the uncertainty which his own wrong has created." *Bige-*

*low v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

For the reasons set forth in my September 30, 1980 damages opinion, I therefore award plaintiff $440,000 as the reasonable value of its business before it was destroyed by defendant's tortious conduct.

So ordered.