COPY–DATA SYSTEMS, INC., and Synergistics, Inc., Plaintiffs-Appellees,

v.

TOSHIBA AMERICA, INC., Defendant-Appellant.

No. 188, Docket 84–7466.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1984.

Decided Feb. 15, 1985.

294

Robert G. Levy, Baltimore, Md. (Berryl A. Speert, Allan P. Hillman, John M. Belferman, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., of counsel), for plaintiffs-appellees.

John J. Witmeyer, III, New York City (Thomas R. Esposito, Elizabeth M. DeCristofaro, Ford, Marrin, Esposito & Witmeyer, New York City, of counsel), for defendant-appellant.

Before OAKES and WINTER, Circuit Judges, and CLARIE,* District Judge.

WINTER, Circuit Judge:

This case arises out of a dispute between a manufacturer, Toshiba America, Inc., ("Toshiba") and two wholesale distributors, Copy-Data Systems, Inc. and its wholly-owned subsidiary, Synergistics, Inc. (collectively, "Copy-Data"). Copy-Data claims, *inter alia*, that Toshiba tortiously destroyed it as a business. After a bench trial, the district court awarded Copy-Data $680,413.86 in damages and interest, an amount found to be Copy-Data's value as a going business. Noting that our consideration of this case has not been aided by the overly long and unfocused briefs submitted by the parties, we reverse.

## BACKGROUND

An understanding of the reasons we reverse requires that we set out in some detail a chronological overview of the history of Copy-Data and its relationship with Toshiba. Appropriate mention will be made wherever facts are disputed.

### 1968

Copy-Data was incorporated by two copier salesmen in February, 1968, to market copying equipment, supplies, and service at the retail level. Initially, Copy-Data's pri-

* The Honorable T. Emmet Clarie, Senior United States District Judge for the District of Connecticut, sitting by designation.

mary line of copying equipment was Remington Rand, although it sold a number of competing brands during its corporate lifetime. Its primary marketing area was New Jersey. Copy-Data established a fiscal year ending each June 30 for accounting purposes, and during the period between February and June, 1968, lost $3,000 on revenues of $89,000.[1]

### 1969

By June, 1969, Copy-Data had expanded its marketing operations into New York City and Connecticut. During the fiscal year ending June, 1969, Copy-Data incurred losses of $64,000 on revenues of $1,120,000.

### 1970

In January, 1970, Copy-Data raised capital of $458,000 from the sale of common stock to the public. This enabled it to pay off some debts and to have positive working capital for the first time. Nonetheless, it incurred a loss for the year ending June, 1970, of $55,000 on revenues of $1,510,000.

Copy-Data's contacts with Toshiba began in the later half of 1970 when Toshiba was considering introducing a coated paper copier into the United States market. In December, 1970, Copy-Data asked Toshiba for an appointment as the exclusive wholesale distributor of Toshiba's coated paper copiers in New Jersey, New York, and Connecticut. Prior to this time, Copy-Data had no experience in wholesaling.

### 1971

In February, 1971, Toshiba began importing coated paper copiers into the U.S. and appointed Copy-Data as Toshiba's exclusive wholesale distributor in New Jersey, New York, Connecticut, Rhode Island, and Massachusetts, and its non-exclusive wholesale distributor in Maine, Vermont, New Hampshire, and Pennsylvania. Toshiba memorialized this appointment in an internal memorandum and letter, but a written contract was never prepared. The next month Copy-Data incorporated Synergistics, Inc. as its wholly-owned subsidiary

through which all wholesale sales of Toshiba equipment were made.

In June, 1971, Copy-Data reported the first of the only two profitable years it ever had, earning $71,000 on revenues of $1,438,000. In November, Toshiba extended Copy-Data a credit line of $50,000.

### 1972

In March, 1972, Toshiba requested that Copy-Data sell Toshiba equipment at the wholesale level in the "Mid-Atlantic" region. The following month, Toshiba raised Copy-Data's line of credit to $60,000.

In June, Copy-Data reported its second and last profitable year, earning $68,000 on revenues of $2,463,000, and reporting $140,000 in working capital. Included in those figures were Synergistics' earnings of $54,000 on wholesale sales of $765,000, of which $555,000 represented sales of Toshiba equipment.

In September, Toshiba invited Copy-Data into the Chicago area, and in the following month again raised Copy-Data's credit line, this time to $90,000.

### 1973

In January, 1973, Toshiba informed Copy-Data that it did not want Copy-Data to acquire any more dealers in the Chicago area. Three months later, Toshiba requested customer lists from all of its wholesale dealers, including Copy-Data, stating, *inter alia*, that it wanted to be able to communicate directly with its retailers about new products and price changes. Copy-Data complied with the request.

For the fiscal year ending in June, Copy-Data (including Synergistics) reported a loss of $166,000 on sales of $3,033,000. Copy-Data's working capital collapsed to $4,000. Synergistics earned a $6,000 profit on total wholesale sales of $1,173,000, of which $837,000 represented wholesale sales of Toshiba equipment.

The next month, Toshiba informed Copy-Data that it intended to market its products directly in the Chicago area, and Copy-Data's presence there was no longer wel-

---

1. These and subsequent financial reporting figures from the record are rounded.

come. At the same time, Toshiba raised Copy-Data's line of credit to $125,000.

In November, Toshiba indicated that it wanted to market its products directly to retailers in the Mid-Atlantic region. However, Toshiba took no action at this time, and Synergistics continued to market Toshiba products in that area. Also in November, Copy-Data, acknowledging the need to retrench, closed its Connecticut retail operation because of continuing losses.

### 1974

In January, 1974, Toshiba demonstrated a prototype of its new plain paper copier at a meeting of Copy-Data's retail distributors. For many years, only Xerox had marketed a plain paper copier in the United States. However, Xerox's patents were expiring and a number of companies, including Toshiba, were introducing competing plain paper copiers. These copiers, like Xerox's, were often more expensive, more complicated, and more unreliable than coated paper copiers. Moreover, they required much more attention from both the dealer and the user. Despite these drawbacks, purchasers generally preferred machines capable of copying on plain paper to coated paper copiers.

A month later, Toshiba again requested that Copy-Data withdraw from the Mid-Atlantic region. In March, Copy-Data complied. The district court found that at the time of its withdrawal, Copy-Data was selling $25,000 of Toshiba equipment per month in that region.

In April, and again in June, Toshiba informed Copy-Data that it, Toshiba, intended at some future time to start direct marketing in the Northeast, and that it would prefer that Copy-Data confine its operations to New Jersey. Copy-Data refused to do so but offered to sell out, an offer refused by Toshiba. At the June meeting, Toshiba also demanded to see Copy-Data's financial statements for the fiscal year just ending. Copy-Data replied that the statements would be available in the near future.

Relations between Toshiba and Copy-Data deteriorated swiftly over the balance of the year. In August, Toshiba reiterated its intention to market its products in the Northeast in competition with Copy-Data and, for the first time, objected to the statement on Copy-Data's letterhead identifying itself as the "Exclusive Northeast Distributors [of] Toshiba Copiers." The next month, Toshiba's sales manager persuaded Copy-Data to buy $50,000 of coated paper copiers on the agreement that the purchase would not be charged to Copy-Data's line of credit. In early October, the sales manager informed Copy-Data that eight new plain paper copiers had arrived, but that Copy-Data had to pay cash for them because it was past due in its bills. Copy-Data denied that it was behind, but borrowed the money from its bank and paid cash for the copiers.

In meetings in October and in November, Toshiba repeated its demand for Copy-Data's financial statements; Copy-Data claimed they were not yet available from its auditors.

In these meetings, Toshiba again took the position that Copy-Data did not have an exclusive distributorship in the Northeast and reiterated its intent to compete on the wholesale level in that area. Toshiba also asserted that Copy-Data was overdue on its account, and that fact, along with its failure to submit financial statements, made it impossible to discuss credit arrangements. At the second meeting, Copy-Data conceded that it was somewhat behind in its payments, although not in the amount claimed by Toshiba. Copy-Data offered to pay cash for any plain paper copiers available, but Toshiba refused to deliver until the credit situation was cleared up. Because the new copiers did not become available in significant quantities until January, 1975, this refusal was not of commercial significance.

Later in November, Copy-Data gave Toshiba its 1974 financial statement. Touche, Ross & Co. had dated its report on the statement August 23. Copy-Data's 10K statement was signed by its Vice President on August 28, but it was not filed with the

Securities and Exchange Commission until November 7.

The financial statement (including Synergistics) showed disastrous losses. For the fiscal year ending in June, 1974, Copy-Data lost $49,000 on revenues of $3,163,000. Working capital had evaporated and was now a deficit of $232,000. Synergistics' total sales were $1,218,000, including $913,-000 of Toshiba equipment, but it lost $4,000. Finally, and most significantly, Copy-Data's auditors, Touche, Ross & Co., refused to express an opinion on the financial statements, because "it [was] impossible to determine the future operational activity of the Company."

After reviewing the financial statement, Toshiba stated that it was concerned about Copy-Data's financial position and requested Copy-Data's September 30th 10Q and monthly financial statements. Toshiba's accounts receivable records of November 30 indicate that Copy-Data owed Toshiba $132,000, of which $111,000 was past due. On December 9, Toshiba informed Copy-Data that it was cutting Copy-Data's line of credit to $50,000. Toshiba explained that Copy-Data had been past due in recent months, Copy-Data's financial statements indicated that it was in serious financial difficulty, and Copy-Data had not provided the further financial statements as requested. Toshiba gave Copy-Data a "month or two" to bring its debts within the new line. After further negotiations, Toshiba agreed to ship 30 plain paper copiers per month, c.o.d., and Copy-Data agreed to pay off its remaining debts by the end of January. During this month, Copy-Data fired its auditors and retained another accounting firm.

In spite of the deterioration of the relationship, Copy-Data remained the sole wholesale distributor of Toshiba equipment in the Northeast throughout 1974.

### 1975

In January, 1975, Toshiba's plain paper copier became available in significant numbers for the first time. However, the dispute over Toshiba's desire to sell the copiers directly in the Northeast remained unresolved, Copy-Data remained on a c.o.d. basis, and on March 25, it brought the instant lawsuit. Despite the suit, Toshiba continued to supply Copy-Data with copiers and to service the machines. In February, Toshiba accepted the return of three damaged plain paper copiers, and in April, after the institution of this suit, Toshiba accepted the return of two more. These returns were accompanied by cover letters from Copy-Data. In May, Toshiba sent all dealers a form to be filled out when returning defective equipment.

Finally, in June, 1975, Toshiba hired its first salesman in the Northeast and direct sales began sometime thereafter.

For the fiscal year ending June 30, Copy-Data (including Synergistics) had a loss of $12,000 (reduced by $52,000 through an accounting change) on revenues of $2,881,-000. Working capital was a negative $173,-000. Synergistics earned $5,000 on its wholesale sales of $1,145,000, including $761,000 of Toshiba equipment. Copy-Data's new accountants, who dated their report in September, also refused to express an opinion on them, again because Copy-Data's future was in serious doubt.

In July, Toshiba asked its dealers to report problems with its copiers in writing monthly. Copy-Data never submitted a written report of such problems with the plain paper copiers. Indeed, in an internal memo, Copy-Data's service manager opined that the Toshiba machine would be good for Copy-Data's dealers as "proved ... in our own Jersey retail branch." Other Copy-Data documents indicated its view that any existing problems were caused by poor service by dealers. At trial, however, Copy-Data claimed to have formed at some point during this period the opinion that Toshiba's plain paper copier was inherently defective and to have made oral requests to Toshiba to accept the return of defective copiers, which requests were refused. It claimed that this refusal to accept for return defective copiers for which it had paid cash ultimately drove it out of business.

Also in September, perhaps to persuade its auditors that it could survive without Toshiba's business, Copy-Data stated that Toshiba was not material to its operations and that the termination of the relationship would not cause serious difficulties. In October, Copy-Data decided to discontinue wholesale operations, and it made its last significant sales of Toshiba plain paper copiers in December.

### 1976

The last financial statement released by Copy-Data covered the nine months from July, 1975 to March, 1976. In it, Copy-Data reported a loss of $281,000. In June, Copy-Data made a general assignment for the benefit of creditors.

### PRIOR PROCEEDINGS

The case was tried before the district court sitting without a jury on a theory of a *per se* violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1982), based on horizontal monopolization by Toshiba in eliminating Copy-Data as a competitor. In an opinion dated June 8, 1979, the district court held that Toshiba's acts constituted a *per se* violation of that Act. The district court singled out six acts by Toshiba that demonstrated an intentional plan by Toshiba to eliminate Copy-Data as a competitor: 1) the takeover of the Chicago market, 2) the demand and receipt of Copy-Data's customer list, 3) the takeover of the Mid-Atlantic market, which, the district court found, was the first act of Toshiba with a negative financial effect on Copy-Data, 4) the sale of coated paper copiers that was charged to Copy-Data's line of credit despite assurances to the contrary, 5) the elimination of Copy-Data's credit line, 6) the refusal to accept the return of defective plain paper copiers for which Copy-Data had paid cash but had sold on credit, this being in the district court's view the final nail in Copy-Data's coffin.

In November, 1981, we reversed and held that Toshiba's acts did not constitute a *per se* violation of 15 U.S.C. § 1. *Copy-Data Systems, Inc. v. Toshiba America, Inc.,* 663 F.2d 405 (2d Cir.1981). We held that

under *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), a manufacturer's territorial restrictions imposed on its distributors were subject to the rule of reason. We noted, however, that "Copy-Data's allegations might be directed more properly to a claim of unfair competition or breach of contract." *Id.* at 411. We originally remanded with instructions to dismiss the complaint but modified the order to permit plaintiffs to pursue their state law claims.

On remand, the district court found, based on the evidence already submitted, that Toshiba had breached an implied covenant of good faith and had committed the tort of unfair competition in destroying Copy-Data. It found such a breach in the same acts upon which it had relied in finding a Sherman Act violation. *Copy-Data v. Toshiba America, Inc.,* 582 F.Supp. 231 (S.D.N.Y.1984). The district court also relied on the previously submitted evidence in concluding that Copy-Data should be valued as of December 31, 1973, and that Copy-Data's value as of that point was $440,000. The district court added $240,-000 in prejudgment interest. From that decision Toshiba appeals once more.

### DISCUSSION

We deal first with the question of whether Toshiba engaged in a course of illegal conduct whether in tort or contract, which was the cause of Copy-Data's commercial demise. After detailing why we believe it did not, we turn to legal theories that might lead to a more limited recovery.

Our view of the facts is admittedly at great variance with that taken by the district court. It is nevertheless consistent with Fed.R.Civ.P. 52(a) since we are left with the "definite and firm" conviction that the district court was clearly erroneous with regard to certain key facts. *United States v. United States Gypsum Co.,* 333 U.S. 364, 394–95, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). In reaching this conclusion, we rely largely on undisputed facts and contemporaneous documentation of unquestioned reliability.

## 1. *The Destruction of Copy-Data's Business*

■ None of the events relied upon by the district court, taken separately or together, support the finding that Toshiba tortiously set out to destroy, and did destroy, Copy-Data.

We begin with an overview of the undisputed facts, which show that Toshiba's actions, whether tortious or not, were not the cause in fact of Copy-Data's bankruptcy. The district court found that the first act of Toshiba with a negative effect on Copy-Data's financial health was Toshiba's assumption of Copy-Data's Mid-Atlantic distributors in March, 1974. Yet in June, 1973, nine months earlier, Copy-Data had negative retained earnings, working capital of only $4,000, and had just suffered a loss of $166,000 for that year. Copy-Data's loss of Mid-Atlantic sales to Toshiba from April to June, 1974, amounted to only $75,000, or less than 3% of Copy-Data's total sales. (Neither the acquisition nor the loss of the Chicago and Mid-Atlantic areas was noted as a material change of business in Copy-Data's 10K statements, which at all times listed only the Northeast area as its principal area of Toshiba sales). Nevertheless, in June, 1974, Copy-Data had a working capital deficit of $232,000 and losses of $49,000. Most significantly, in June, 1974, at a time when Toshiba's actions could have had only a negligible impact, Copy-Data's auditors, Touche Ross, added a "going concern" opinion to its financial statements. A "going concern" opinion is a most serious qualification on a financial statement because it generally indicates the auditor's opinion that a company is faced with a serious risk of bankruptcy, and, therefore, that valuation of its assets as part of a going concern may be incorrect.[2]

Moreover, wholesale sales of Toshiba equipment never accounted for more than 30% of Copy-Data's annual revenue, and Synergistics, the subsidiary that marketed Toshiba equipment, operated either at or near the break-even point in every year save 1972. It is clear on the undisputed facts that Copy-Data's bankruptcy was not caused by its dealings with Toshiba but by its inability to earn a profit on any of its other businesses.

Putting aside for the moment Copy-Data's claims that Toshiba misappropriated Copy-Data's property in its customer lists and breached the distributorship contract—claims leading to more limited relief—we conclude that Toshiba's actions were neither tortious nor in breach of contract. The district court placed much emphasis on the following incidents: (i) Toshiba "tricked" Copy-Data into purchasing $50,-000 in coated paper copiers so as to use up its credit line and render it unable to purchase the more desirable plain paper copiers; (ii) Toshiba tortiously cut Copy-Data's line of credit as part of the scheme to destroy it; and (iii) the plain paper copiers were defective and Copy-Data's refusal to accept them for return was a significant cause of its bankruptcy. We do not conceal our puzzlement at the vigor with which Copy-Data presses two such facially

---

**2.** Montgomery's *Auditing* states in part:

*Going Concern.* The concept that financial statements are prepared on the basis of a 'going concern' is one of the basic tenets of financial accounting (paragraphs 1022.17 and 1025.04 of AICPA Prof.Stds., vol. 3). That is the assumption that assets will 'expire' and liabilities will be liquidated in the ordinary course of continuing business activity. Because the going concern assumption is so basic, the standard auditor's report does not make reference to it.

However, when a company becomes insolvent or operates for long periods with a net outflow of cash or is unable to meet currently maturing obligations, the going concern assumption must be questioned. That question immediately raises a number of questions about realizable value of assets, the order of payment of liabilities, and the proper classification and carrying amounts of both; the unexpired historical carrying amounts may become inappropriate (usually they are in excess of liquidation values). Reasonable assurance that the company will not have to suspend operations—a 'going concern opinion'—must be explicitly considered, and if it cannot be reached, the auditor's report must be qualified to report that fact.

P. DeFeliese, K. Johnson, R. MacLeod, *Montgomery's Auditing* (9th ed. 1975), p. 776.

inconsistent claims as (i) and (iii). Taken at face value, it would seem that the "trick" prevented Copy-Data from buying unmarketable goods.

A review of the record reveals that the sale of the coated paper copiers to Copy-Data did not injure it economically, its line of credit was cut with ample legal cause, and the plain paper copiers were not wrongfully refused for return. First, the purchase of the coated paper copiers did not prevent Copy-Data from getting its initial supply of plain paper copiers, albeit with the aid of a bank loan. In addition, there is no evidence that Copy-Data lost money on the sale of the coated paper copiers. Indeed, it included in its claims of damages lost profits on the additional coated paper copiers it would have sold had it not gone out of business.

The claim about the "trick" sale of coated paper copiers is little more than an obfuscation designed to put a bad light on Toshiba's cutting of Copy-Data's credit line in the fall of 1974, an act found by the district court to be part of the plan formulated by Toshiba in 1973 to destroy Copy-Data. However, the history of the party's credit relationships absolutely belies this conclusion. Initially, Toshiba extended Copy-Data a credit line of $50,000 in November, 1971, raised it to $60,000 in April, 1972, and to $90,000 in October, 1972, and raised it again to $125,000 in July, 1973. The last increase itself undercuts Copy-Data's theory of the deliberate destruction of its business since it came after Toshiba's acquisition of the customer lists and its demand that Copy-Data leave Chicago. Increasing a line of credit to a company one is about to destroy is not plausible conduct.

Copy-Data's line of credit remained at $125,000 until at least October, 1974, the month in which the district court found (over defendant's strong objections) that Toshiba cut it. Since Toshiba did not receive Copy-Data's financial statements until November, cutting the line of credit in October was viewed by the district court as a demonstration of Toshiba's bad faith. However, it is undisputed that Toshiba repeatedly requested Copy-Data's financial statements throughout the summer and fall of 1974, and that Touche Ross's auditor's report attached to those statements was dated August 23, 1974. The district court apparently credited testimony that the auditor's reports were always backdated. However, Harry Winston, Vice President of Copy-Data, signed the 1974 10K statement on August 28, although it was not filed with the Securities and Exchange Commission until November 7. Plainly, Copy-Data was deliberately withholding the financial statement from Toshiba in order to conceal its poor financial condition and was, at the time the line was cut, either behind in its accounts with Toshiba or on the verge of being so. Moreover, the 10K statement should have been filed with the Securities and Exchange Commission by October 1. 17 C.F.R. § 240.15d–1 (1974). Even if the credit line was cut in October, therefore, the failure to produce the 1974 financial statements by then had a significance upon which Toshiba was entitled to act.

■ We cannot on these facts give any weight whatsoever to the cutting of Copy-Data's line of credit as part of a tortious scheme to destroy it. Copy-Data's decision to withhold its financial data demonstrates its consciousness of their implications for its credit standing. Absent contractual provisions to the contrary, manufacturers are not required to extend credit to distributors in serious financial difficulties. *See Turntables Inc. v. Gestetner,* 52 A.D.2d 776, 382 N.Y.S.2d 798 (1976) (not required to continue credit after assurances demanded but not provided).

Finally, the claim that the plain paper copiers were defective and that Toshiba wrongfully refused to accept them for return, described in Copy-Data's brief as the "cornerstone" of its damage claim, is wholly implausible on this record. Toshiba's refusal is said to have occurred well after the present litigation began. However, despite the pendency of this action and the sharp deterioration of the underlying commercial relationship, despite Copy-Data's

successful return with cover letters of five plain paper copiers damaged in shipment, and despite its claim that Toshiba's refusal to accept defective machines for return came at a critical moment in Copy-Data's commercial life, there is not a single document in the record reflecting a request to Toshiba to accept defective copiers for return.

The documents that are in evidence indicate that Toshiba had earlier supplied particular documentation to accompany requests to return, and requested written information on problems with the machines. Moreover, Copy-Data's own internal memoranda indicate that it regarded existing problems with the machines as dealer service problems, not inherent defects. We are thus left with oral testimony that Copy-Data sought to return defective copiers in numbers unspecified then or now, without identification then or now by serial number, and without specifying then or now the precise defect claimed for each machine.[3] This oral testimony strains credibility, but, even assuming it to be true, there is nothing wrongful in Toshiba's refusal to respond to oral requests of such generality.

Upon examination, therefore, the record shows no tortious scheme by Toshiba to destroy Copy-Data.

### 2. Breach of Contract and Misappropriation of the Customers Lists

■ Insofar as the breach of contract claim is concerned, we begin by pointing out that the contract between Toshiba and Copy-Data was unwritten, and the parties never agreed on a time or manner of termination. Under New York law, a contract of agency with no stated duration is terminable after a reasonable duration and reasonable notice. *Colony Liquor Dist., Inc. v. Jack Daniel Distillery—Lem Motlow Prop., Inc.*, 22 A.D.2d 247, 254 N.Y. S.2d 547 (1964); *Noah v. L. Daitch & Co.*, 22 Misc.2d 649, 652, 192 N.Y.S.2d 380, 385

(1959); *Restatement (Second) of Agency* § 442 comment c (1958). The district court found that in a "narrow chronological sense," 582 F.Supp. at 236, Toshiba had provided Copy-Data with reasonable notice when it cancelled Copy-Data's distributorships in Chicago, the Mid-Atlantic and the Northeast. However, it also concluded that the "course of conduct which surrounded and led to each of these terminations was so unreasonable as to deprive Copy-Data of the opportunity to recoup its investment in the development of the Toshiba distribution network." *Id.* We disagree.

Copy-Data withdrew from the Chicago and Mid-Atlantic areas voluntarily upon a request from Toshiba. We may accept as true Copy-Data's assertion that it did so not out of a desire to give up these sales but solely to appease Toshiba so as to maintain a working relationship. However, contractual liability for excluding Copy-Data from Chicago and the Mid-Atlantic region exists, if at all, only if Toshiba procured Copy-Data's withdrawal by concealing an intent to terminate the entire relationship and carried out that intent thereafter. Because, as the discussion in the preceding section indicates, the deterioration and ultimate disruption of that relationship was the result, rather than the cause, of Copy-Data's grave financial condition, no such liability follows. Copy-Data's failure to produce the oft-requested financial statements after the 10K was due to be filed on October 1 clearly permitted Toshiba to put it on a cash only basis, and the later evidence of financial collapse justified termination of the relationship under New York law. *Gestetner*, 52 A.D.2d at 777, 382 N.Y.S.2d at 799 (seller can suspend deliveries when it reasonably suspects buyer insolvent); *Trace X Chemical, Inc. v. Canadian Industries Ltd.*, 738 F.2d 261, 1984–2 Trade Cas. (CCH) ¶ 66,089 (8th Cir. 1984) (cutting buyer's credit when auditors do not render unqualified opinion and buy-

---

**3.** The district court found only that Toshiba refused to accept "the defective machines." When it went bankrupt, Copy-Data had 20 To- shiba machines in inventory of the 200 it had purchased. No claim was made that these 20 were defective..

er is past due is valid business judgment); *Fromm Sales Co. v. Troy Sunshade Co.,* 222 Md. 229, 233–4, 159 A.2d 860, 863 (1960); N.Y.U.C.C. Law § 2–609 (McKinney 1964).

■ We believe similar reasoning applies to Toshiba's acquisition and use of the customer lists. We may assume *arguendo* that, if it had led Copy-Data to expend time, money and effort in creating a distribution system, Toshiba would be obligated to allow Copy-Data a reasonable opportunity to exploit the property interest in the customer lists and not to appropriate it for itself. However, we find no violation of that obligation. First, we believe Toshiba did not breach any implied covenant merely by obtaining the list. The dealers involved were not end users but firms selling or leasing Toshiba products under the Toshiba name and so advertising themselves. Toshiba had a legitimate interest, absent express contractual provisions to the contrary, in knowing who these dealers were. A manufacturer in Toshiba's position may need such a list to contact retailers directly about pricing, advertising, and new products, to guard against the financial failure of its wholesale distributors, and to protect the good will of its trade name. *Johnson v. McKee Baking Co.,* 398 F.Supp. 201, 207 (W.D.Va.1975) (under Virginia law, manufacturer has legitimate interest in having distributor conduct business so as to reflect favorably on manufacturer as well as distributor).

Second, the only use of these lists for purposes of direct distribution by Toshiba before June, 1975, was in the Chicago and Mid-Atlantic regions. We believe Copy-Data consented to the use of these lists in those areas by voluntarily withdrawing from them. Again, we note the possibility that use of the lists might breach an implied covenant of good faith if Toshiba thereafter wrongfully terminated the relationship. However, for reasons already stated at length, no such wrongful termination occurred.

Reversed.