In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-3580

JOHNSON BANK,

*Plaintiff-Appellant*,

*v.*

GEORGE KORBAKES & CO., LLP,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 2678—**Rebecca R. Pallmeyer**, *Judge*.

_____

ARGUED SEPTEMBER 12, 2006—DECIDED DECEMBER 18, 2006

_____

Before EASTERBROOK, *Chief Judge*, and POSNER and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. In this diversity suit governed by Illinois law, a bank complains that it lost money as a result of errors in an audit of one of its borrowers, Brandon Apparel Group, Inc., by the defendant, GKCO. The bank contends both that it is a third-party beneficiary of the letter contract by which Brandon retained GKCO to conduct the audit and that GKCO committed the tort of negligent misrepresentation. The district judge rejected the bank's contract claim without much discussion but conducted a bench trial of the tort claim and afterwards

entered judgment in GKCO's favor on both the contract and tort claims.

GKCO argues that the bank abandoned its contract claim in the district court and so should not be heard to renew it in this court. The bank argues that it did not abandon it. No matter; the claim has no possible merit. To be a third-party beneficiary of a contract is to have the rights of a party, which is to say the power to sue to enforce the contract. *People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.*, 400 N.E.2d 918, 919-20 (Ill. 1980); *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927) (Holmes, J.); *Restatement (Second) of Contracts* § 304 (1981). Parties to contracts are naturally reluctant to empower a third party to enforce their contract, so third-party beneficiary status ordinarily is not inferred from the circumstances but must be express. *People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.*, *supra*, 400 N.E.2d at 919; *155 Harbor Drive Condominium Ass'n v. Harbor Point Inc.*, 568 N.E.2d 365, 374-75 (Ill. App. 1991); *A.E.I. Music Network, Inc. v. Business Computers, Inc.*, 290 F.3d 952, 955 (7th Cir. 2002) (Illinois law). It wasn't in this case. The fact that Brandon wanted the audit in order to help it get additional loans from the bank doesn't show that GKCO consented to have the bank enforce the engagement letter. And the fact that the bank knew about the audit contract and received the audit report doesn't mean that GKCO knew that the bank would be relying on the report to guide its decision on lending Brandon more money, and, knowing that, meant to assume the costs of misplaced reliance should it make mistakes in the audit. Cf. *Alaniz v. Schal Associates*, 529 N.E.2d 832, 834 (Ill. App. 1988).

The claim of negligent misrepresentation has a slightly better grounding, and let us turn to that claim.

Brandon made and sold clothing, although it also licensed the making and selling of much of its clothing in exchange for a percentage of the licensee's sales revenues. Brandon began borrowing money from Johnson Bank in 1997 and by the end of April 1999 owed the bank $10 million—and wanted more, and the bank lent it more, which the bank lost, along with the $10 million, when Brandon went broke the next year.

It was in late April of 1999, when Brandon was seeking the additional loan from the bank, that it instructed GKCO to give the bank the audit report that GKCO had just completed. The report summarized Brandon's financial results for 1998 and revealed that the firm had serious problems. But the report contained errors, which the bank argues painted Brandon's situation in brighter hues than the audit justified and as a result induced the bank to keep lending to Brandon.

The report classified a $1 million claim in a lawsuit that Brandon had brought against its previous owner as a "contra liability," which means an offset to liabilities, and thus in effect an asset. It should have been classified as a "gain contingency," and such a contingency, because of its uncertainty, should not be listed on the company's books as a gain unless and until it materializes. *SEC v. Yuen*, No. CV 03-4376 MRP (PlAX), 2006 WL 1390828, at *9 (C.D. Cal. Mar. 16, 2006); Financial Accounting Standards Board, *Statement of Financial Accounting Standards No. 5*, ¶ 17, pp. 7-8 (1975); Jan R. Williams & Joseph V. Carcello, *Miller GAAP Guide* 9.02 (2004). By treating the claim as a contra liability, the report made it look (at least if one looked no farther than the label) as if Brandon were worth up to $1 million more than it would otherwise

have appeared to be worth, though how much more would depend on the probability of Brandon's prevailing in the lawsuit, which nobody knew.

Another error was the audit's classification of the licensee's sales as sales by Brandon itself, which inflated Brandon's listed sales by more than 50 percent. Brandon's *income* from the licensee's sales was not inflated as a result of the classification. But still it was wrong to treat sales by another company as if they were Brandon's sales, because it made Brandon look much bigger than it actually was.

GKCO also permitted Brandon to treat as prepaid expenses what the bank argues were actually accounts receivable. A prepaid expense is an asset created by a firm's paying for some good or service in advance. An example is insurance; the premium is paid before a claim is submitted to the insurance company. An account receivable is an asset consisting of a right to payment from a customer. Although there is always a risk that a supplier whom one has paid in advance will default, the likelihood is generally less than that an account receivable will prove uncollectible, because a company is likely to know its suppliers better than it knows its customers, and is therefore less likely to be stiffed by a supplier than by a customer. That is why prepaid expenses and accounts receivable are required to be listed separately on the balance sheet—with the latter reduced by an allowance for bad debts. Williams & Carcello, *supra*, at 3.07-.08. But the asset in question in this case involved a credit from a supplier, which is properly classified as a prepaid expense. *Galli v. Metz*, No. 87-CV-973, 1991 WL 175334, at *8 (N.D.N.Y. Sept. 9, 1991), rev'd in part on other grounds, 973 F.2d 145 (2d Cir. 1992); *In re Integrated Health Services, Inc.*, 344 B.R. 262, 271 (Bankr. D. Del. 2006).

The other errors of which the bank complains were contested, and they were either trivial or found by the district judge, with adequate basis in the record, not to be errors. Still, there were errors in the report—the listing of a gain contingency as a contra liability and of a licensee's sales as the licensor's sales. But here is the rub. The tort of negligent misrepresentation does not create liability for violating accounting conventions, as such; the elements of the tort must be present. In addition, under Illinois law an auditor is liable to a third party, that is, to someone different from the firm that hired it to audit its books, only if the auditor knew that the firm wanted to use the audit report to influence a third party, 225 ILCS 450/30.1; *Kopka v. Kamensky & Rubenstein*, 821 N.E.2d 719, 726 (Ill. App. 2004). The audit report might flunk Accounting 101, but if the report didn't mislead anyone toward whom the auditor had a duty of care, the auditor would not have committed a tort.

That is this case. A footnote in the report identified the "contra liability" as a claim in a lawsuit. The note did not suggest that the lawsuit was a sure thing for Brandon; all it said was that "The Company [Brandon] is currently a plaintiff in a lawsuit against Pearson [the company's previous owner] wherein they allege that Pearson misrepresented the value of the assets sold and liabilities assumed in the acquisition of the business . . . . Should the Company not prevail in the lawsuit, the $1,000,000 will be reclassified to goodwill, representing an additional amount paid at acquisition in excess of the fair market value of the assets acquired." As a sophisticated financial enterprise, the bank could not reasonably have treated the auditor's characterization of the claim as an assurance by the auditor that Brandon would win its suit

and if so obtain and collect a $1 million award. How would the auditor know? If the bank wondered how solid the claim was, it could have investigated.

The licensee's sales should not have been lumped in with Brandon's. But once again, a footnote eliminated any possibly misleading impression by disclosing clearly the amount of the licensee's contribution to Brandon's sales numbers.

At root the bank's argument for liability is that it was entitled to look no farther than the bottom-line numbers in the audit report. That is incorrect; it had no right to ignore the footnotes in the report, which together with the numbers in it gave the reader an accurate picture of Brandon's financial situation. The bank cannot base a claim for damages on a refusal to read. The audit report even says that "the notes on the accompanying pages are an integral part of these financial statements." See Clyde P. Stickney & Roman L. Weil, *Financial Accounting: An Introduction to Concepts, Methods, and Uses* 17 (2000).

The bank argues that by the end of 1998, when the audit was completed, Brandon's financial situation was so lousy that the audit should have included a "going concern qualification," that is, a warning that the audited firm was teetering on the brink of bankruptcy. *Copy-Data Systems, Inc. v. Toshiba America, Inc.*, 755 F.2d 293, 299 (2d Cir. 1985); see American Institute of Certified Public Accountants, "The Auditors Consideration of an Entity's Ability to Continue as a Going Concern," *Statement on Auditing Standards,* No. 59, ¶ 5-6, pp. 3-4 (1988). But the Bank was complicit in the omission of a going-concern qualification. For before receiving the audit report it had agreed to waive a number of restrictions in the loan covenants precisely in order to spare Brandon the dreaded

warning, which by indicating a serious risk of bankruptcy would have scared off trade creditors and accelerated the bankruptcy.

The bank imputes to GKCO a duty to advise it whether lending more money to this faltering firm (throwing good money after bad, as the saying goes) would make commercial sense. But an auditor's duty is not to give business advice; it is merely to paint an accurate picture of the audited firm's financial condition, insofar as that condition is revealed by the company's books and inventory and other sources of an auditor's opinion. E.g., *Bily v. Arthur Young & Co.*, 834 P.2d 745 (Cal. 1992); Jay M. Feinman, "Liability of Accountants for Negligent Auditing: Doctrine, Policy, and Ideology," 31 *Fla. St. U. L. Rev.* 17, 21-22, 55-56, 58 (2003). An auditor who fulfills that duty, or fails but manages not to mislead the intended readers of the audit report, has no tort liability. Erroneous characterizations *can* mislead, but not when the facts mischaracterized are fully and accurately disclosed in the audit report, as they were here.

The district judge was right, moreover, to find that the bank did not rely on the mischaracterizations. It kept lending money to Brandon in the hope of keeping the firm from going broke and thus keeping alive the hope of eventual repayment. That decision—the cause of the bank's undoing—had nothing to do with the audit.

The losses the bank incurred as a result of the additional loans that it made beginning in May 1999 could not be recovered as damages even if GKCO had been guilty of negligent misrepresentation. GKCO could not have predicted how much money the bank would lend to Brandon in reliance on the audit and with what consequences.

Damages so speculative are not recoverable in a lawsuit. *Trigano v. Bain & Co., Inc.*, 380 F.3d 22 (1st Cir. 2004); *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000); *World Radio Laboratories, Inc. v. Coopers & Lybrand*, 557 N.W.2d 1 (Neb. 1996); cf. *Haslund v. Simon Property Group, Inc.*, 378 F.3d 653, 658 (7th Cir. 2004) (Illinois law).

The other issues raised by the bank are thoroughly considered and correctly resolved in the district judge's meticulous 35-page opinion; we have nothing to add.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*