In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-3441

DECATUR VENTURES, LLC, *et al.*,

*Plaintiffs-Appellants*,

*v.*

KIMBERLY DANIEL,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:04-CV-00562-JDT-WTL—**John Daniel Tinder**, *Judge*.

———————

ARGUED MARCH 30, 2007—DECIDED MAY 4, 2007

———————

Before EASTERBROOK, *Chief Judge*, and BAUER and
WILLIAMS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Michael Stapleton made
Trent Decatur a terrific offer: Stapleton would locate
"under-valued" homes, arrange to borrow more than the
actual purchase price, and use the surplus to fix up the
properties so that they could be rented. All Decatur had
to do was agree to repay the loans. Stapleton promised to
supply the down payment, do the repairs, and locate the
tenants. Decatur could put his feet up on the desk and
wait for the rentals to roll in, enough to retire the loans
with profit to spare.

Like most offers too good to be true, this was not true.
After remitting "rents" just long enough to persuade

Decatur to invest in additional properties, Stapleton pocketed the money. Or so Decatur says in this suit; for now we must take his allegations as given. Decatur and several other investors—we use "Decatur" to represent all of the victims—maintain that Stapleton had helpers. One aide was Courtenay Stocker, who used his position at NovaStar Home Mortgage, Inc., to line up lenders. According to the complaint, Stocker was in on the scam but the lenders were not. They thought the properties worth more than the amount being advanced.

Lenders thought this because the files contained appraisals signed by both Lisa Phillips and Kimberly Daniel. For $300 per parcel, Phillips promised to provide an inflated appraisal. (To repeat: This is just an allegation. Nothing has been proved. We shall not repeat this caution, but the reader must keep it in mind.) Phillips was an apprentice (a "licensed trainee appraiser" under Indiana law) and needed supervision. Phillips engaged Daniel to provide that supervision. Indiana requires the appraiser to accompany the apprentice to the site the first 50 times they work together. 876 Ind. Admin. Code §3-6-9(j)(1). Daniel sometimes accompanied Phillips but usually didn't; she vouched for whatever Phillips proposed without adhering to professional standards of verification, such as spot-checking the supposedly comparable properties. When Daniel signed some forms showing that she had not seen the appraised property herself, she provided these to Phillips in a way that made it easy for Phillips to change them so that they falsely showed that Daniel had done what the law (and the lender) require. So the loans were made, and Decatur is on the hook for payment, which will cost him a good deal more than he can raise by selling the properties.

An example illustrates how the scheme worked. These round numbers do not fit any of the actual transactions, but they give the idea. Stapleton located a house that the owner was willing to sell for $50,000. Phillips appraised

the property at $100,000; Daniel verified this appraisal. Stocker prepared papers showing that the owner had contracted to sell the parcel to Decatur for $100,000; Stocker also lined up a bank willing to lend $90,000 against Decatur's promise to repay (plus a mortgage on the real estate). Decatur signed papers verifying that $100,000 was the actual price and that the $10,000 down payment to be produced at closing would be his money. Both of Decatur's representations were false: he knew that the property cost less (he expected Stapleton to use the difference for renovations) and put up none of his own money. At closing the $10,000 came from Stapleton—and went right back to him, as none of that cash reached the seller. The bank's $90,000 was divided between the seller ($50,000) and Stapleton ($40,000), who paid $300 to Phillips for her assistance (with $50 going from Phillips to Daniel). That left $39,700 to be split between Stocker and Stapleton, who might send a few monthly payments of "rent" Decatur's way to keep the fish on the hook while more deals were arranged. As this example illustrates, Decatur was no angel; his willingness to deceive the lender was vital. But for current purposes the defense of *in pari delicto* need not be considered.

Federal and state claims—RICO plus fraud and negligence—against Stapleton (plus Stapleton Ventures, Inc.) and Stocker (plus NovaStar) are awaiting trial in the district court. Similar claims against Phillips have been dismissed without prejudice; plaintiffs have concluded that she is judgment-proof. But Daniel carried insurance. The district court granted summary judgment in her favor after concluding that appraisers in Indiana owe duties to lenders but not borrowers such as Decatur. 2006 U.S. Dist. LEXIS 56589 (S.D. Ind. Aug. 11, 2006). Appraisers are liable to third parties only for fraud. But because Indiana treats an appraisal as an opinion rather than a fact, the representation could be fraudulent only

if the appraisal's author did not believe her own numbers. And of that, the district judge concluded, there is no evidence. This ruling wrapped up the claim against Daniel, and the district court entered a judgment under Fed. R. Civ. P. 54(b).

"Indiana follows *Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, J.), in limiting the liability of accountants, lawyers, and other professionals when persons receive their reports and opinions second-hand. See *Essex v. Ryan*, 446 N.E.2d 368 (Ind. App. 1983)." *Ackerman v. Schwartz*, 947 F.2d 841, 846 (7th Cir. 1991). In a jurisdiction that follows *Ultramares*, a professional owes a duty of care only to his client plus any third party who the professional knows will see and rely on any opinion he renders. Indiana has applied this approach to appraisers. See *Emmons v. Brown*, 600 N.E.2d 133 (Ind. App. 1992). Daniel's client was either NovaStar or Stapleton (the record is not clear which), and she knew that the lender would review and rely on her reports. Lenders require appraisals to protect themselves from the people who are tempted to misrepresent the value of security in order to get their hands on more money. Nothing in the record suggests that Daniel anticipated that Decatur would rely on her work to protect himself from his own folly in believing Stapleton. Decatur does not cite (and we could not find) any case in Indiana holding an appraiser liable to a buyer for careless preparation of an opinion furnished to a lender.

Decatur tries to get around this obstacle by arguing that NovaStar or Stapleton acted as his agent in the transaction, and that he was at least a third-party beneficiary of the appraisals. The idea is that appraisals are designed to help buyers get financing. That theory is fundamentally incompatible with the lender's goal of self-protection and with *Ultramares*. Indiana eventually may abandon that doctrine (it represents a minority approach

among the states), but we doubt that the state would do so by treating people the professional has never heard of, and who are not the professional's clients, as third-party beneficiaries of a contract between the professional and the actual client. That exception would swallow the rule. And the argument that NovaStar and Stapleton were Decatur's agents is loopy. Stocker and Stapleton were in league *against* Decatur. He dealt with them at arms' length.

In *Ackerman*, on which Decatur vainly relies, the professional (a lawyer rendering a tax-shelter opinion) sent the opinion directly to (real) agents working on behalf of potential investors. The lawyer knew that potential investors would rely on the opinion; inducing them to part with their money was the point of the exercise. But Daniel did not send her appraisal to Decatur or anyone representing his interests, and, as we have stressed, appraisers expect lenders to use their opinions to protect themselves *from* borrowers. Decatur's own complaint alleges that he set out to deceive the lender about the purchase price of the real estate. That's why lenders need protection! Decatur knew that the appraisal always exceeded the actual transaction price. He may have believed that the real estate would be worth more than the loan after improvements, which the surplus loan proceeds would fund, but he did not rely on Daniel for the proposition (which he knew to be false) that each unimproved parcel was worth the amount reported to the lender as the price Decatur paid.

This leaves the possibility that Daniel could be liable for committing fraud, a theory that even unanticipated recipients of a professional's report may invoke. What we've already said implies that Decatur did not rely on Daniel's statements. But the district court granted summary judgment for a more fundamental reason: there was no fraud. Indiana treats appraiser's reports as opinions, which can be neither true nor false, and hence not

fraudulent unless the speaker disbelieves her own words. See *Kreighbaum v. First National Bank & Trust*, 776 N.E.2d 413, 421 (Ind. App. 2002); *Block v. Lake Mortgage Co.*, 601 N.E.2d 449, 451 (Ind. App. 1993); see also *Wheatcraft v. Wheatcraft*, 825 N.E.2d 23, 30-31 (Ind. App. 2005) ("The general rule is that statements of value are regarded as mere expressions of opinion."). Decatur has not argued that Daniel recognized that Phillips was whipping up bogus estimates.

An argument to that effect might have been available. Honest estimates should be randomly distributed around the truth. The estimates for which Daniel vouched, however, were always high—*way* high. The record contains both the actual transaction price and the Phillips/ Daniel appraisal for seven properties. The appraisal was as much as 500% of the transaction price and never less than 114%; the average was 178% of the prices that Stapleton had negotiated with the sellers. A statistical analysis of these estimates, compared with the normal variation of honest estimates in the appraisal business, might have established whether this degree of difference between appraised prices and real transactions prices reasonably could be ascribed to chance.

Instead of offering such an analysis, however, Decatur hired his own appraiser (David Woods) in an effort to show how wrong Daniel had gone. Woods was about as far off, in the other direction, as the Phillips/Daniel appraisals: Woods signed his name to estimates that were only 64% of actual transaction prices. Why Decatur thought to compare one appraisal with another, rather than with real prices, is hard to fathom. Any opportunity to use statistics to imply that Daniel must have smelled a rat has been bypassed. What's more, the fee of $50 per report would not have tipped her off (by suggesting that she was being paid to look the other way, or being compensated for risk); the record implies that this fee is ordinary.

This drives Decatur to argue for vicarious liability. Phillips must have understood that she was supplying false appraisals. We know that Phillips lied about some objectively verifiable claims; for example, her appraisals often overstated the number of square feet in the houses (and never erred in the opposite direction). Her alteration of Daniel's certificates is fraud and implies willingness to lie about other subjects too. According to Decatur, Phillips's state of mind should be imputed to Daniel because Indiana requires supervising appraisers to "take full responsibility" for trainees' reports. 876 Ind. Admin. Code §3-6-9(i).

What does "full responsibility" mean? It could mean that Daniel "must submit to professional discipline as if she had written the reports"; it could mean that Daniel "is liable in civil litigation as if she had written the reports"; it could mean that Daniel "is liable in civil litigation to the same extent as the person who actually wrote the reports." The last of these three possibilities is vicarious liability, but the first two are not, because they do not impute Phillips's state of mind to Daniel—and the first possibility is never of use to any plaintiff.

Indiana's judiciary has not chosen among these meanings; indeed, the state's courts have never cited 876 Ind. Admin. Code §3-6-9. Nor, for that matter, has a similar provision in any other state been the subject of a reported decision that we know of. Section 3-6-9 is part of Indiana's licensure code, which suggests that the first possibility (that the rule is limited to professional discipline) is the one that Indiana's judiciary is likely to select. And if the state were to apply the rule in litigation, it probably would not use it as the basis of vicarious liability. Indiana has adopted (through incorporation by reference in 876 Ind. Admin. Code §3-6-2, 3) the Uniform Standards of Professional Appraisal Practice. These standards, which may be

found at http://commerce.appraisalfoundation.org/html/
2006%20USPAP/toc.htm, provide among other things that:

> An appraiser must not communicate assignment
> results in a misleading or fraudulent manner. An
> appraiser must not use or communicate a mislead-
> ing or fraudulent report or *knowingly* permit an
> employee or other person to communicate a mis-
> leading or fraudulent report.

USPAP Conduct (Ethics Rule) ¶4 (emphasis added). The
knowledge requirement in this standard is incompatible
with vicarious liability for another person's fraud.

Section 3-6-9(i) appears to be similar in function to Rule
5.1 of the ABA's *Model Rules of Professional Conduct*. The
2007 version of this rule provides:

> **Rule 5.1 Responsibilities Of Partners, Manag-
> ers, And Supervisory Lawyers**
>
> (a) A partner in a law firm, and a lawyer who
> individually or together with other lawyers pos-
> sesses comparable managerial authority in a law
> firm, shall make reasonable efforts to ensure that
> the firm has in effect measures giving reasonable
> assurance that all lawyers in the firm conform to
> the Rules of Professional Conduct.
>
> (b) A lawyer having direct supervisory authority
> over another lawyer shall make reasonable efforts
> to ensure that the other lawyer conforms to the
> Rules of Professional Conduct.
>
> (c) A lawyer shall be responsible for another law-
> yer's violation of the Rules of Professional Conduct
> if:
>
> > (1) the lawyer orders or, with knowledge of the
> > specific conduct, ratifies the conduct involved;
> > or

> (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

If Phillips and Daniel were lawyers, Rule 5.1(c)(1) would limit Daniel's liability to specific conduct of which she has "knowledge". The knowledge requirement shows that the supervisor is not vicariously liable for a supervised person's fraud. See Ronald D. Rotunda & John S. Dzienkowski, *Legal Ethics: The Lawyer's Deskbook on Professional Responsibility* 890 n.15 (2006 ed.). We doubt that Indiana would understand §3-6-9(i) and USPAP Conduct (Ethics Rule) ¶4 differently.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*