In the

# United States Court of Appeals
### For the Seventh Circuit

No. 06-3366

GREGORY S. FEHRIBACH,

*Plaintiff-Appellant*,

*v.*

ERNST & YOUNG LLP,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 03-CV-00551—**John Daniel Tinder**, *Judge*.

ARGUED MAY 24, 2007—DECIDED JULY 17, 2007

Before POSNER, KANNE, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff is the trustee of
Taurus Foods, Inc., a small company engaged in the
distribution of frozen meats and other foods, which was
forced into bankruptcy under Chapter 7 of the Bankruptcy
Code by three of its creditors. The suit charges the com-
pany's auditor, Ernst & Young, with negligence and
breach of contract in failing to include a going-concern
qualification in an audit report. The charges are governed
by Indiana's Accountancy Act of 2001 because they arise
out of an agreement to provide professional accounting
services. Ind. Code § 25-2.1-1. The case is before us on the

trustee's appeal from the grant of summary judgment to the defendant.

In October 1995, Ernst & Young issued its audit report for Taurus's fiscal year 1995, which ran from January 1994 to January 1995. The report did not indicate a "substantial doubt about the [audited] entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited." American Institute of Certified Public Accountants, *Statement on Auditing Standards No. 59* (1988); see *Johnson Bank v. George Korbakes & Co.*, 472 F.3d 439, 443 (7th Cir. 2006); *Copy-Data Systems, Inc. v. Toshiba America, Inc.*, 755 F.2d 293, 299 (2d Cir. 1985); *Drabkin v. Alexander Grant & Co.*, 905 F.2d 453, 456 (D.C. Cir. 1990). That date was January 1995. So the report indicated no "substantial doubt" that Taurus would continue as a going concern until at least January 1996. In fact Taurus didn't declare bankruptcy until two years later.

Taurus's principal banker was Bank One. In May 1996, some months after Taurus received the audit report from Ernst & Young, the bank became alarmed by the deterioration in Taurus's financial condition and handed the account to its Milwaukee office, which specialized in handling risky loans. That office imposed restrictions on Taurus that exacerbated the company's business troubles. In an attempt to stave off disaster, Lisa Corry, the company's chief financial officer (and the daughter of one of the company's two owners), started defrauding Bank One by inflating the company's sales and accounts receivable in daily reports that Taurus was required to make to the bank. She was eventually caught, prosecuted, convicted, and sent to prison. *United States v. Corry*, 206 F.3d 748 (7th Cir. 2000). The bankruptcy followed closely upon the exposure of her fraud.

The trustee presented expert evidence that Ernst & Young was negligent in failing to include a going-concern qualification in its audit report for the 1995 fiscal year, and that if it had done so the owners of Taurus—who were not absentees, but managed the company—would have realized that the company had no future and would immediately have liquidated, averting costs of some $3 million that the company incurred as a result of its continued operation under the restrictions imposed by Bank One's Milwaukee office and other adversities.

The trustee's damages claim thus is based on the theory of "deepening insolvency." This controversial theory (see, e.g., *In re Global Service Group, LLC*, 316 B.R. 451, 456-59 (Bankr. S.D.N.Y. 2004)) allows damages sometimes to be awarded to a bankrupt corporation that by delaying liquidation ran up additional debts that it would not have incurred had the plug been pulled sooner. As originally formulated, the theory was premised on the notion that borrowing after a company becomes insolvent would "ineluctably" hurt the shareholders. *Schacht v. Brown*, 711 F.2d 1343, 1350 (7th Cir. 1983). That was a puzzling suggestion because by hypothesis a company harmed by *deepening* insolvency was insolvent before the borrowing spree, so what had the shareholders to lose? But a corporation can be insolvent in the sense of being unable to pay its bills as they come due, Jeffrey M. Lipshaw, "Law as Rationalization: Getting Beyond Reason to Business Ethics," 37 *U. Toledo L. Rev.* 959, 1016 (2006) ("equity" insolvency), yet be worth more liquidated than the sum of its liabilities and so be worth something to the shareholders; this was assumed to be a possibility in *Schacht*. 711 F.2d at 1348.

The theory could also be invoked in a case in which management in cahoots with an auditor or other outsider

concealed the corporation's perilous state which if disclosed earlier would have enabled the corporation to survive in reorganized form. Sabin Willet, "The Shallows of Deepening Insolvency," 60 *Bus. Law.* 549, 565-66 (2005). However, as explained in *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 204 (Del. Ch. 2006), the theory makes no sense when invoked to create a substantive duty of prompt liquidation that would punish corporate management for trying in the exercise of its business judgment to stave off a declaration of bankruptcy, even if there were no indication of fraud, breach of fiduciary duty, or other conventional wrongdoing. Nor would it do to fix liability on a third party for lending or otherwise investing in a firm and as a result keeping it going, when "management…misused the opportunity created by that investment…. [T]hey [management] could have instead used that opportunity to turn the company around and transform it into a profitable business. They did not, and therein lies the harm to [the company]." *In re Citx Corp.*, 448 F.3d 672, 678 (3d Cir. 2006).

The present case is different from any of the cases that we have cited. The owners of Taurus lost their entire investment when the company became insolvent. They had nothing more to lose. The only possible losers from the prolongation of the corporation's miserable existence were the corporation's creditors. In a state that allows creditors (or shareholders) of the audited firm to sue the auditor for negligent misrepresentation, provided that the creditors' reliance on the auditor's report was foreseeable, e.g., *Citizens State Bank v. Timm, Schmidt & Co.*, 335 N.W.2d 361, 366 (Wis. 1983)—or, in some states, was actually foreseen, *Rhode Island Hospital Trust Nat'l Bank v. Swartz, Bresenoff, Yavner & Jacobs*, 455 F.2d 847, 851 (4th Cir.

1972); *Ryan v. Kanne*, 170 N.W.2d 395, 401-03 (Iowa 1969)—Taurus's creditors could sue Ernst & Young directly. But Indiana, we have held (albeit with only tenuous support in Indiana case law, as pointed out in *First Community Bank & Trust v. Kelley, Hardesty, Smith & Co.*, 663 N.E.2d 218, 219-20, 223-24 (Ind. App. 1996)), adheres to a close approximation to *Ultramares Corp. v. Touche*, 174 N.E. 441 (N.Y.1931) (Cardozo, C.J.). And under the *Ultramares* doctrine, or what we have taken to be its Indiana version, creditors in the position of Taurus's creditors, not having a contractual relation with the auditor, have no claim against it. *Decatur Ventures, LLC v. Daniel*, 485 F.3d 387, 390 (7th Cir. 2007) (Indiana law); *Ackerman v. Schwartz*, 947 F.2d 841, 846-47 (7th Cir. 1991) (same); see *PricewaterhouseCoopers, LLP v. Massey*, 860 N.E.2d 1252, 1259-60 (Ind. App. 2007).

Taurus had the contractual relation, and thus could sue, though because it is in bankruptcy and has been liquidated the suit is really on behalf of the creditors; anything that reduces the liquidation value of the corporation hurts them. That doesn't make the suit an impermissible end run around Indiana's limitation of creditor (or shareholder) suits against auditors. Realistically, a corporation is a conduit for its stakeholders, but that does not affect the corporation's legal rights. Suppose Taurus were solvent, yet still had been injured by the auditor's alleged negligence. The ultimate beneficiaries of the suit would be Taurus's shareholders, but no one would suppose this anomalous even though the shareholders themselves—the stakeholders in this example—could not have sued the auditor. Remember that under Indiana law (or what we have assumed to be Indiana law), Ernst & Young has no duty of care to the creditors. But it does of course have such a duty to its client, Taurus, and that duty,

on which this suit is founded, does not evaporate just because the client is bankrupt and any benefits from suing will accrue to its creditors.

The trustee's claim fails nevertheless, but fails on the facts, though not because Taurus survived for more than a year (in fact three years) after the audit period. A going-concern qualification is just a prediction; if it should have been included in the audit report and harm resulted as a foreseeable consequence of its omission, the auditor is liable to the firm audited for that harm. *Johnson Bank v. George Korbakes & Co.*, *supra*, 472 F.3d at 443; see *Ziemba v. Cascade Int'l Inc.*, 256 F.3d 1194, 1208-11 (11th Cir. 2001). Such cases are rare because it is unusual for the audited firm to be able to make a plausible contention that it could not have been expected to recognize its financial peril on its own even though it supplied the financial information on which the audit was based. *Devaney v. Chester*, No. 83 CIV. 8455, 1989 WL 52375 (S.D.N.Y. May 10, 1989). The purpose of an audit report is to make sure the audited company's financial statements—which are prepared by the company, not by the auditor, Jay M. Feinman, "Liability of Accountants for Negligent Auditing: Doctrine, Policy, and Ideology," 31 *Fla. St. U.L. Rev.* 17, 21-22 (2003)—correspond to reality, lest they either have been doctored by a defalcating employee or innocently misrepresent the company's financial situation. The auditor is therefore required "to state whether, in his opinion, the financial statements are presented in conformity with generally accepted accounting principles and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period." American Institute of Certified Public

Accountants, "Responsibilities and Functions of the Independent Auditor," in *Codification of Statements on Accounting Standards*, § 110.01 (2007); see *Bily v. Arthur Young & Co.*, 834 P.2d 745 (Cal. 1992). There is no contention that Ernst & Young failed to notice discrepancies between the statements and the company's actual financial situation. There were no discrepancies. And no information that the report contained or should have contained if the audit was carefully done indicated that Taurus couldn't limp through another year—the report revealed positive though slight net income in the most recent fiscal year and no obligations that would mature in the next year and by doing so might drive the firm under.

It is true that the report failed to warn Taurus of ominous trends in the frozen-meat distribution business. Intensified competition from national firms was causing Taurus to lose customers, thus depressing the firm's revenues; at the same time, the company's costs were rising because of higher workers' compensation premiums and other untoward developments. But predicting Taurus's future cash flow on any basis other than the financial statements for the audit year (which would for example reveal existing loan-repayment obligations) was not the function of the audit report. Ernst & Young had not contracted to provide Taurus with management-consulting services. "[A]n auditor's duty is not to give business advice; it is merely to paint an accurate picture of the audited firm's financial condition, insofar as that condition is revealed by the company's books and inventory and other sources of an auditor's opinion." *Johnson Bank v. George Korbakes & Co.*, *supra*, 472 F.3d at 443.

But there is need to qualify what we have just said. The requirement that the auditor disclose in its report any

substantial doubt it has that the firm will still be a going concern in a year expands the auditor's duty beyond that of verifying the accuracy of the company's financial statements. The accounting standards require the auditor to be on the lookout for "certain conditions or events that, when considered in the aggregate, indicate there could be substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time. . . . The following are examples of such conditions and events":

- *Negative trends*—for example, recurring operating losses, working capital deficiencies, negative cash flows from operating activities, adverse key financial ratios

- *Other indications of possible financial difficulties*—for example, default on loan or similar agreements, arrearages in dividends, denial of usual trade credit from suppliers, restructuring of debt, non-compliance with statutory capital requirements, need to seek new sources or methods of financing or to dispose of substantial assets

- *Internal matters*—for example, work stoppages or other labor difficulties, substantial dependence on the success of a particular project, uneconomic long-term commitments, need to significantly revise operations

- *External matters that have occurred*—for example, legal proceedings, legislation, or similar matters that might jeopardize an entity's ability to operate; loss of a key franchise, license, or patent; loss of a principal customer or supplier; uninsured or underinsured catastrophe such as a drought, earthquake, or flood.

American Institute of Certified Public Accountants, "The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern," *supra*, § 341.06. It is the last bullet point, referring to "external matters," that stretches the auditor's duty—especially, so far as bears on this case, the reference to "loss of a principal customer or supplier." Elsewhere the standards emphasize that the auditor must have "an appropriate understanding of the entity *and its environment*." *Id.*, §§ 314.01-.02 (emphasis added).

Yet nowhere is the auditor required to *investigate* external matters, see *id.*, §§ 314.01-.17, as distinct from "discover[ing them] during the engagement." Elizabeth K. Venuti, "The Going-Concern Assumption Revisited: Assessing a Company's Future Viability," *CPA Journal* (May 2004), www.nysscpa.org/printversions/cpaj/2004/504/p40.htm (visited June 25, 2007). An accounting firm that conducts an annual audit of a multitude of unrelated firms in a multitude of different industries cannot be expected to be expert in the firms' business environments. Large accounting firms like Ernst & Young do divide their practice into industry groups, and the accountants assigned to a particular group doubtless know a lot about the companies. But the auditor is not hired to assess the supply and demand conditions facing the audited firm. If the auditor is told by the firm or otherwise learns from the information that it collects in conducting the audit that the firm's near-term prospects are endangered by pending legislation, the loss of a customer, or other "conditions or events," then it must factor the information into its assessment of the firm's risk of going under within a year. But it is not expected to duplicate the expertise assumed to reside in the firms themselves and in management consultants specializing in the firm's industry. Ernst & Young could not have been expected to know more about trends in the frozen-meat

distribution business than Taurus, which had been in that business for more than 20 years.

So the trustee's claim has no merit—and it is also barred by the one-year statute of limitations in the Accountancy Act, which begins to run when "the alleged act, omission, or neglect is discovered or should have been discovered by the exercise of reasonable diligence." Ind. Code § 25-2.1-15-2. The parties assumed in the district court that only if the date of discovery was more than a year before the bankruptcy was filed, which was in January 1998, rather than more than a year before the action against Ernst & Young was brought by the trustee (originally as an adversary action, but later moved to the district court under 28 U.S.C. § 157(d)), would the suit be time-barred. The Bankruptcy Code extends the statute of limitations for the filing of adversary actions by the trustee to two years after the declaration of bankruptcy. 11 U.S.C. § 108(a). The suit was filed more than three years after the declaration of bankruptcy, but Ernst & Young failed to raise the point in the district court, so it is forfeited in this court.

The district judge found, however, that by the fall of 1996, more than a year before the bankruptcy, Lisa Corry knew everything she had to know in order to determine whether the company had been injured by Ernst & Young's failure to have included a going-concern qualification in the audit report for Taurus's 1995 fiscal year. Her knowledge—that of a senior officer responsible for the company's finances—is treated as that of the company. It would not be had she been stealing *from* the company, *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 454 (7th Cir. 1982), since as we mentioned earlier one task of an auditor is to protect the company against dishonest employees. But she was stealing *for* the company. More precisely, she

was stealing for the owners, *id*. at 454-55; for all we know, she may have been hurting the creditors. But remember that the auditor had no legally enforceable duty of care to the creditors.

The parlous state of Taurus's finances was fully known by Corry (a C.P.A., though she had allowed her C.P.A. license to expire since she was working exclusively for Taurus) when she embarked on her course of fraud more than a year before the bankruptcy. The trustee argues that Corry thought Taurus could weather the storm—which is indeed a possible explanation of her decision to commit fraud on the company's behalf. If Taurus would indeed have been better off liquidating earlier than later, Corry would not have been motivated to commit a fraud intended to delay the liquidation. Yet the critical event that doomed the company, according to the trustee, was Bank One's imposition of restrictions on Taurus in May of 1996. So the argument has to be that had Ernst & Young included the going-concern qualification in its audit report of October 1995, Bank One would have acted sooner, precipitating an earlier liquidation. This possibility was fully known to Corry by the fall of 1996. The effect of the restrictions imposed by Bank One was amplified when Taurus's sales plummeted during the summer of 1996, but Corry knew all about this too, yet it didn't deflect her from trying to avert liquidation.

So the suit was correctly dismissed. But the trustee argues that, even if that is so, the district court should not have taxed costs to him because Taurus is indigent. The idea that an indigent should not be taxed costs, though it crops up from time to time (not as an absolute bar, but as a factor for the district court to consider, e.g., *In re Paoli R.R. Yard PCB Litigation*, 221 F.3d 449, 462-64 (3d Cir. 2000);

*Flint v. Haynes*, 651 F.2d 970, 973-74 (4th Cir. 1981)), is peculiar, since if a defendant is truly indigent, he (or it) can't pay costs. However, "indigency" rarely connotes absolute poverty, for think of the requirement that prisoners pay a portion of their filing fees even if they can't pay the whole amount up front. 28 U.S.C §§ 1915(b)(1), (2). And when the "indigent" is a bankrupt, the issue will usually be, as in this case, not whether the bankrupt can pay but whether it should be required to allocate part of its remaining assets to a victorious opponent in litigation rather than to its creditors.

We cannot think of any reason to prefer the creditors over the winner of a suit brought on their behalf against him. Corporations, moreover, are not allowed to proceed *in forma pauperis*, *Rowland v. California Men's Colony*, 506 U.S. 194, 201-06 (1993), and to allow them to escape paying costs, on grounds of indigency, would blur the distinction between individuals and corporations. For these reasons, it is indeed "better to award costs 'as of course' (which is what [Fed. R. Civ. P. 54(d)] says) and leave to bankruptcy the question whether collection is possible. Discretion may be exercised against an award when the victor has run up costs or otherwise abused the judicial process, but the parties' relative wealth is not a good reason to deny costs to the winner, any more than a losing litigant's indigence would be a good reason to withhold an award of damages for battery, theft, or breach of contract." *Rivera v. City of Chicago*, 469 F.3d 631, 637 (7th Cir. 2006) (concurring opinion).

The judgment and the award of costs are

AFFIRMED.

ROVNER, *Circuit Judge, concurring*.  I agree that this action is barred by the statute of limitations, and would limit the decision to that issue alone.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*