In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3842

THE HA2003 LIQUIDATING TRUST,

*Plaintiff-Appellant,*

*v.*

CREDIT SUISSE SECURITIES (USA) LLC,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 04 C 3163—**Robert W. Gettleman**, *Judge.*

ARGUED SEPTEMBER 25, 2007—DECIDED FEBRUARY 20, 2008

Before EASTERBROOK, *Chief Judge*, and BAUER and KANNE, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. HA-LO Industries made and sold "promotional products"—items such as coffee mugs bearing company logos that could be given to employees or used to advertise the firms' businesses. In the 1990s HA-LO began to explore ways of making sales through electronic commerce rather than a traditional sales force. Toward the end of 1999 John Kelley, HA-LO's CEO, decided that the way to enter the world of electronic commerce was to acquire Starbelly.com, Inc., a startup that Kelley believed had a promising e-commerce system—but that was burning through venture capital at

$3 million a month, had never made a sale, and thus was a risky proposition.

HA-LO agreed to purchase Starbelly.com for $240 million, of which between $70 million and $100 million would be paid in cash and the rest in HA-LO stock. The cash was more than HA-LO had in hand, and paying that much would have placed it in violation of several loan covenants. In need of advice, HA-LO hired Credit Suisse First Boston (CSFB) (now Credit Suisse Securities) as an investment banker and Ernst & Young as a business consultant.

CSFB tried to renegotiate the price, structure payments to prevent a violation of loan covenants, arrange new credit facilities to cover the cash outlay, and obtain standstill agreements from Starbelly.com's investors (who otherwise might be able to use the stock received in the acquisition to take effective control of HA-LO). It also gave HA-LO a "fairness opinion" representing that, "as of the date hereof [January 17, 2000], the Merger Consideration is fair to HA-LO from a financial point of view." Both CSFB's engagement letter and the fairness opinion specified that CSFB relied on HA-LO's financial projections, which it had not tried to verify. That was the task of Ernst & Young, which told Kelley and HA-LO's Board of Directors that the projections were unrealistic. Ernst & Young concluded that Starbelly.com was unlikely to generate anywhere near the projected revenue stream. Kelley did not accept that advice. The parties have stipulated that "Kelley presented HA-LO's Board with revenue projections for Starbelly even though he knew these projections were based on assumptions about Starbelly's technology Kelley knew to be false."

A proxy solicitation sent to shareholders in April 2000 included a copy of CSFB's fairness opinion. Investors approved the merger, which closed in May 2000.

Starbelly.com's technology never paid off for HA-LO. Within months HA-LO was in financial distress, not only because of the hefty cash payout (which led to debt-service obligations) but also because Starbelly.com encountered continuing losses. In July 2001 HA-LO entered bankruptcy. A successor to HA-LO emerged from the firm's reorganization (see http://www.halo.com), as did a trust for the benefit of its creditors. The HA2003 Liquidating Trust was formed to collect as much as possible from anyone associated with the disastrous transactions of 1999 and 2000 and distribute the proceeds to the firm's pre-bankruptcy creditors. This suit against CSFB is one of the Trust's endeavors. It was filed under the diversity jurisdiction; the governing law, specified by the engagement letter between HA-LO and CSFB, is that of New York.

The engagement letter obliges HA-LO to hold CSFB harmless from all losses not caused by "bad faith or gross negligence". The Trust does not accuse CSFB of bad faith but does maintain that the fairness opinion was the result of gross negligence. According to the Trust, CSFB (a) should have relied on Ernst & Young's evaluation of Starbelly.com's prospects, rather than the projections furnished by HA-LO's board and officers, and (b) should have withdrawn its opinion, or at least prepared a new one, after the market price of many dot-com stocks began to decline.

The district court held a bench trial and concluded that CSFB had not been grossly negligent. It had neither the ability nor the obligation to outsmart the stock market, the technology sector of which (represented by the NASDAQ Composite Index) peaked in mid-March 2000, just when the Trust insists that any fool could have seen that prices should be much lower. In April and May 2000 the index was below its historic high but approximately the same as it had been in December 1999, when the

deal had been negotiated. The district court added that HA-LO had contracted and paid for one opinion, not a series of opinions, and it was stipulated that even after a major investor asked management in April 2000 to secure a new fairness opinion, "Kelley's failure to seek a new valuation of Starbelly and a 'bring down' opinion was not simply inattention, but was a deliberate choice. Instead of requesting an updated fairness opinion . . . Kelley continued to support the merger, on the terms and at the original price he had negotiated".

The district court found it impossible to label as "grossly negligent" CSFB's decision to do what the contract *required* it to do: use the figures and projections furnished by its client. The district court added that, because Kelley and other members of HA-LO's board actually knew everything that the Trust accuses CSFB of ignoring, it is impossible to establish damages. (Indeed, the parties stipulated that "E&Y's technology due diligence had revealed to Kelley that the [Starbelly revenue] projections were wholly speculative exercises".) These factual findings—and whether someone is negligent is a question of "fact" (albeit an "ultimate fact") for the purpose of Fed. R. Civ. P. 52, see *Cicero v. United States*, 812 F.2d 1040, 1041 (7th Cir. 1987); cf. *Pullman-Standard v. Swint*, 456 U.S. 273 (1982)—are dispositive unless clearly erroneous, which they are not.

Much of the Trust's brief reflects a view that fairness opinions are worthless (but expensive) paper, purchased by corporate managers at the urging of the Supreme Court of Delaware in decisions such as *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985) (*Trans Union*). Some scholars think *Trans Union* and its successors mistaken, see Daniel R. Fischel, *The Business Judgment Rule and the Trans Union Case*, 40 Bus. Law. 1437 (1985); Steven M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557

(2006), and others doubt that fairness opinions contain much useful information, given their dependence on management's numbers and the malleability of discounted-cash-flow analysis that underlies most of these opinions. See, e.g., Lucian Arye Bebchuk & Marcel Kahan, *Fairness Opinions: How Fair Are They and What Can Be Done About It?*, 1989 Duke L.J. 27 (1989). Still others have concluded that, whether or not *Trans Union* was wise, competitive forces have shaped the terms and conditions under which fairness opinions are prepared so that they are today valuable to investors. See Charles W. Calomiris & Donna M. Hitscherich, *Banker Fees and Acquisition Premia for Targets in Cash Tender Offers: Challenges to the Popular Wisdom on Banker Conflicts*, 4 J. Empirical Legal Studies 909 (2007).

But why should it matter to this case who is right in that debate? If the Supreme Court of Delaware had held in a tort suit that all of HA-LO's promotional mugs must be shipped in crates made of inch-thick steel, to prevent all risk that pottery shards from breakage in transit could escape and injure anyone, that would greatly increase the costs of doing business and injure HA-LO's investors but would not support an award of damages against the sellers of steel crates. Like our hypothetical crate maker, CSFB is fulfilling a market demand. The possibility that judges, regulators, or legislators have caused "too much demand" for a particular service, inducing firms to buy something worth less than its price, is no reason to mulct the service's provider.

CSFB followed the norm in this business—more to the point, it followed the rules in its contract with HA-LO—and relied on management's numbers. It told HA-LO to hire someone to check those numbers. Separating number-creation from number-evaluation is not illegal and may make business sense. The division of labor between number verifiers (Ernst & Young) and

number crunchers (CSFB) is not to be sneezed at; the division of labor has large benefits for an economy, as it allows specialists to do what they are best at.

After Ernst & Young told HA-LO that its expectations about the Starbelly.com technology and prospects were wildly excessive, HA-LO stuck to its guns. It can't blame that on CSFB. This suit is nothing but an attempt to find a deep pocket to reimburse investors for the costs of managers' blunders. Cf. *Fehribach v. Ernst & Young LLP*, 493 F.3d 905 (7th Cir. 2007). But CSFB did not write an insurance policy against managers' errors of business judgment. Compelling investment banks to provide business-risks insurance as part of a fairness opinion would just make investors worse off, as that would increase the price of each opinion. Investors would pay *ex ante* for any benefit received *ex post*—and the bar would pocket a substantial portion of the transfer payments. Insurance is cheaper (free, really) when achieved via the stock market. Investors can diversify their holdings; then when acquir*ing* firms, such as HA-LO, overpay in an acquisition, investors gain in their role as shareholders of the acquir*ed* firms. Diversification protects investors without the costs of insurance and litigation.

The Trust's assertion that CSFB should have foreseen the end of the dot-com boom is an appeal to hindsight. The NASDAQ Composite Index was higher in March 2000, when the materials for the shareholders' vote were written, than when the deal was negotiated (the index stood at 3,715 on December 16, 1999). On May 3, 2000, when the merger closed, the NASDAQ Composite Index was 3,707, up from mid-April (when it had been as low as 3,321), though down 36% from its high of 5,046 on March 9, 2000. Prices were volatile; no one knew whether it would go up or down next. (Indeed, no one knows today the future direction of the stock market.) Was

the reverse temporary or a portent of doom? Inability to see the future differs from "gross negligence." If CSFB was too optimistic, then so were all of HA-LO's managers and millions of investors who bought dot-com stocks in 1999 and 2000. Empirical studies too numerous to recount show that people who lack inside information can't beat the market—either the market as a whole, or the price for particular stocks—for more than brief periods.

Trying to turn lemons into lemonade, the Trust insists that the downturn after March 9, 2000, should have led CSFB to yank its opinion as "stale" and write a new one. This supposes that CSFB could distinguish short-term from long-term reverses, and there is no reason to think that it could (let alone that a lack of prescience is "gross negligence"). Investors who bought technology stocks in April and May 2000—for every seller there is a buyer, after all—surely did not think that they were putting themselves in a must-lose position. But if as the Trust insists "everyone knew" that the decline that began in March 2000 was bound to continue, and that a bubble had burst, then it was unnecessary for CSFB to say so. HA-LO's board, and its investors who had to vote in April 2000, could look at the stock market for themselves. It is unnecessary to restate what is already in plain view of the investing public. See *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989). And, to repeat, CSFB undertook to deliver an opinion as of one date. Updates require extra work, which must be paid for. HA-LO's managers not only did not offer to pay CSFB for an updated opinion but also, as the parties stipulated, decided not to request such an opinion even if CSFB had been willing to render one for free.

In the end, the Trust wants us to throw out the detailed contract that HA-LO and CSFB had negotiated and to make up a set of duties as if this were tort litigation. That would be a mistake, one very costly for investors

at other firms who would have to pay a risk premium to investment bankers in the future. Intelligent adults can set their own standards of performance, and courts must enforce the deal they have struck. See *Wallace v. 600 Partners Co.*, 658 N.E.2d 715 (N.Y. 1995). The engagement contract says that CSFB has no duty to double-check the predictions about Starbelly.com's future revenues and no duty to update its opinion. CSFB did what it was hired to do. The Trust's belief that CSFB should have been hired to do something different is not a basis of liability.

AFFIRMED

A true Copy:

　　　Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*