# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-3007

FREEDOM MORTGAGE CORPORATION,

*Plaintiff-Appellant*,

*v.*

BURNHAM MORTGAGE, INCORPORATED, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 6508—**Robert W. Gettleman**, *Judge*.

ARGUED JUNE 1, 2009—DECIDED JUNE 23, 2009

Before EASTERBROOK, *Chief Judge*, and BAUER and EVANS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. The goal of a mortgage-flipping scam is to deceive a potential lender about the value of the collateral. Go-between G finds a building for sale and arranges its sale to Buyer B for more than its market value. B borrows the money for the purchase, assisted by Appraiser A, who certifies to the lender that the property is worth more than the

actual purchase price. Someone else (if not G himself) certifies that B has put in a substantial down payment. (Most lenders limit their exposure to 90% or less of the property's value; the buyer's equity not only is extra security but also ensures that the buyer will keep the property in good shape.) Here is an example. Go-between finds a property that can be purchased for $50,000. Appraiser certifies that it is worth $100,000. Buyer agrees to buy the property for $50,000 but tells Lender that the price is $100,000 and that B will put up $20,000 of his own funds. Lender provides the rest. At closing, $50,000 of Lender's money is paid to the original owner; B and G split $30,000 (less the fee already paid to Appraiser). B vanishes and never makes a payment on the mortgage. When Lender forecloses, it suffers a $30,000 loss. See generally *Decatur Ventures, LLC v. Daniel*, 485 F.3d 387 (7th Cir. 2007).

Freedom Mortgage Corporation contends in this suit that the defendants conducted such a scam. The principal defendants, Burnham Mortgage (a broker) and its manager John Jeffrey Hlava, played the role of G in our example. (So Freedom alleges; its assertions have yet to be tested but must be accepted for current purposes.) Other defendants played the roles of Buyer B and Appraiser A. Two of the Buyer defendants have pleaded guilty to criminal charges of fraud. Other Buyer defendants cannot be located (Freedom Mortgage says that Burnham used phony names), and one insists that her identity had been stolen and that she had nothing to do with the transaction. The Appraiser defendants say that their appraisals were honest. Two title insurers

complete the cast of defendants. The insurers promised
to indemnify Freedom Mortgage not only for any defects
in title but also for damages caused by failure to close
the real-estate transactions according to Freedom's
specifications. Freedom says that Burnham and Exeter
Title closed deals with phantom buyers, at phony prices,
and without the promised down payments, entitling it
to indemnity from the insurers. The insurers (Exeter
and Ticor Title) have refused to pay, asserting that
Burnham and Exeter followed Freedom's closing instruc-
tions.

Freedom contends that it is entitled to recoup its
losses under contracts with Burnham and the insurers. It
also contends that all defendants are liable in tort for
participating in a fraudulent scheme; it seeks actual and
punitive damages. Finally, Freedom maintains that the
fraudulent scheme was conducted using the mails and
interstate telecommunications system, exposing the
defendants to treble damages under 18 U.S.C. §1964(c),
part of the Racketeer Influenced and Corrupt Organiza-
tions Act. (Mail and wire fraud are predicate offenses
under RICO. 18 U.S.C. §1961(1)(B).)

The large number of defendants, roles, and transactions
has caused the litigation to become protracted. It has not
helped that the case is on its third district judge. In 2006
Judge Filip, the second judge assigned to the case, con-
cluded in a lengthy opinion that Freedom's potential
recovery is limited by the fact that it (or its agents) pur-
chased the properties at foreclosure sales. Freedom used
the mechanism of a credit bid. In other words, Freedom

bid some or all of the outstanding balance of the loan, rather than cash. The judge concluded that, as a matter of Illinois law, even though only Freedom and the buyers were parties to the foreclosures, Freedom cannot recover damages from any third party by contending that the property was worth less than the amount of the credit bid. 2006 U.S. Dist. LEXIS 10538 (N.D. Ill. Mar. 13, 2006).

Here's an illustration. Freedom loaned $244,211.37 on the security of the real property at 7953 South Escanaba Avenue in Chicago. When the buyer defaulted, Freedom made a credit bid of $143,500 at the auction. That was the winning bid. The state court awarded Freedom the property and a default judgment of $100,711.37. Freedom resold the property, realizing only $92,978.15. The district court held that Freedom can not argue in this suit that the property was worth less than $143,500. The court reserved for future decision whether Freedom can recover punitive damages under state law, or treble damages under RICO, on account of this property, and whether any of the non-buyer defendants may be liable for the $100,711.37 deficiency. (The state court's order forbade Freedom to collect this deficiency from the buyer but did not mention insurers and other third parties.)

Defendants then filed a welter of motions for summary judgment. Some of these motions argued the merits and some that damages had been wiped out. Before acting on these motions, Judge Filip accepted an appointment as Deputy Attorney General and resigned from the

bench. The case was reassigned to Judge Gettleman, who granted the motions for summary judgment on the ground that Judge Filip's opinion shows that the federal suit is barred by claim preclusion, see 28 U.S.C. §1738 (state law governs the effect of state judgments), plus the *Rooker-Feldman* doctrine. See *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). As Judge Gettleman saw things, Freedom is trying to wage a collateral attack on the state judgments. 2008 U.S. Dist. LEXIS 54465 (N.D. Ill. July 11, 2008).

In this court the parties engage in vigorous debate about whether Judge Gettleman correctly understood and applied Judge Filip's opinion. That topic is irrelevant. The question we must decide is not the relation between two opinions of the district court, but whether the judgment of the district court correctly applies the Illinois law of preclusion and the *Rooker-Feldman* doctrine. Those legal issues are open to plenary consideration here.

We start with the *Rooker-Feldman* doctrine, because it is a jurisdictional rule. Only the Supreme Court of the United States may review the judgment of a state court in civil litigation. But Freedom Mortgage isn't trying to overturn any judgment. The question at hand is the effect of the foreclosure judgments, under the state's law of issue and claim preclusion. The *Rooker-Feldman* doctrine does not displace §1738 and turn all disputes about the preclusive effects of judgments into matters of federal subject-matter jurisdiction. See *Lance v. Dennis*, 546 U.S. 459 (2006). The *Rooker-Feldman* doctrine is con-

cerned with "cases brought by state-court losers complaining of injuries caused by state-court judgments". *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005). Freedom Mortgage, the *winner* in the state cases, complains about injuries caused by fraud that predated the state litigation and is neither addressed nor redressed by the foreclosure judgments. The *Rooker-Feldman* doctrine does not prevent the pursuit of compensation for injury caused by fraudulent schemes, even though §1738 and the principles of defensive non-mutual issue preclusion may limit the recoverable damages.

As for preclusion: Why would either issue or claim preclusion block *all* recovery against non-parties to the state proceedings? Take a simple situation. Freedom lends to Borrower B against two kinds of security: the real property, and a guaranty of B's note by a solvent obligor, such as B's rich uncle. If B defaults, Freedom will foreclose on the note and mortgage, then try to collect the deficiency judgment from B's uncle. Illinois law permits a separate action on the guaranty. See *Farmer City State Bank v. Champaign National Bank*, 138 Ill. App. 3d 847, 852, 486 N.E.2d 301 (1985); *LP XXVI, LLC v. Goldstein*, 349 Ill. App. 3d 237, 811 N.E.2d 286 (2004). The uncle cannot invoke claim preclusion on the theory that all potentially liable parties must be joined in the foreclosure action. Nor can the uncle use issue preclusion to avoid payment. A lender's credit bid conclusively resolves the property's market value. Thus Freedom could not lend $250,000, make a credit bid of $200,000, and still collect more than $50,000 on the uncle's guar-

anty. Judge Filip's comprehensive opinion covers that ground; we need not repeat its explanation. See also *Chrysler Capital Realty, Inc. v. Grella*, 942 F.2d 160 (2d Cir. 1991) (Michigan law); *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 900 P.2d 601 (1995). But Freedom *could* collect the unpaid $50,000 from the guarantor. And if, as a matter of Illinois law, a lender may sue a guarantor separately, why not a mortgage broker, title insurer, appraiser, or other potentially liable entity?

Defendants' answer is that collection against a guarantor is justified by the waiver clause common in guaranty contracts. The guaranty at issue in *LP XXVI*, for example, waived "any and all rights or defenses arising out of . . . any 'one action' or 'anti-deficiency' law". 349 Ill. App. 3d at 238. None of their contracts has such language, defendants submit.

The problem with this argument is that there was no such language in the guaranty at issue in *Farmer City State Bank*, and the court in *LP XXVI* made nothing of the waiver. Language of this sort is added by lawyers drafting an instrument that will be used in many states. What *Farmer City State Bank* and *LP XXVI* hold is that Illinois does not require all claims to be made in a single action, and there is no need for a waiver of a nonexistent mandatory-joinder rule. Illinois follows the same-transaction approach to claim preclusion. See *River Park, Inc. v. Highland Park*, 184 Ill. 2d 290, 309–10, 703 N.E.2d 883 (1998). *Farmer City State Bank* and *LP XXVI* concluded that claims on a guaranty do not arise from the same transaction as the note. A claim on a note de-

pends on the borrower's promise to pay; a claim on a guaranty depends on the lender's inability to collect from the borrower. Most guarantees are discharged when the borrower pays (or the collateral proves to be sufficient); that's enough to show that claims on the note and guaranty don't rest on the same transaction. Often a claim on a guaranty must wait until other sources of payment have been exhausted, and the deficiency judgment in the foreclosure action resolves how much the guarantor owes.

Claims against the borrower on the note, and against a mortgage broker for fraud, are even less related than claims on a note and guaranty. The questions litigated in a mortgage foreclosure action are (a) did the borrower make the promised payments?, and, if not, then (b) how much is the collateral worth? The sort of questions that Freedom wants to litigate against these defendants are: (a) did they obtain spurious appraisals?; (b) did they misrepresent the borrowers' identities?; (c) did they misrepresent the amount of the borrowers' down payments; and (d) did they manage an "enterprise" through a "pattern of racketeering activity"? Whether the borrower paid is distinct from whether these defendants committed fraud that induced Freedom to make loans, or whether Burnham followed Freedom's prescribed closing procedures (the main issue in the action on the insurance policies). We cannot imagine any argument for allowing a separate action on a guaranty, while precluding a separate action against people who induced the loan through fraud.

So much for claim preclusion—the modern name for the merger and bar components of res judicata. See *Taylor v. Sturgell*, 128 S. Ct. 2161, 2171 n.5 (2008). Defendants get some aid from issue preclusion (collateral estoppel), given the rule that Freedom is stuck with the value of its credit bids. But this does not eliminate damages. Deficiency judgments remain, and the non-borrower defendants cannot shelter behind the clause in these judgments precluding collection from the borrowers. The total amount of deficiency judgments on the properties at issue in this suit is almost $600,000. If Freedom can make out its claim on the merits, some or all of these defendants may be liable for that shortfall. Indeed, if Freedom prevails on its RICO claim, some or all of the defendants may be liable for three times that shortfall. Punitive damages also may be available under Illinois law. Nothing in the rule that a credit bid establishes the collateral's value blocks any of these remedies.

The state court's judgments may have some other effects as well. For example, the insurers contend that Freedom's willingness to forego the collection of any deficiency from the borrowers impairs their right of subrogation and so releases the claims on the insurance contracts. That may or may not be right; if the borrowers were phantoms, or judgment proof, Freedom has not surrendered anything of value to the insurers. The insurance contracts bar recovery only "to the extent that" the right of subrogation has been impaired, which means, Freedom says, that the insurers must show what they lost as a result of the no-collection-from-the-borrowers clauses in the state judgments. It would be premature

to address this issue now. Wrongly believing that Freedom's claim was entirely blocked by the very fact of the credit bids, the district court did not tackle this subject. This and the other unresolved issues deserve the district court's speedy attention. This suit has passed its sixth anniversary and should not be allowed to grow a beard.

The judgment is reversed, and the case is remanded for proceedings consistent with this opinion.